

United States District Court, D. Minnesota.
AXCAN SCANDIPHARM INC., Plaintiff,
v.
ETHEX CORPORATION, KV Pharmaceutical
Company, Global Pharmaceuticals, and Impax
Laboratories, Inc., Defendants.
**No. 07-2556 (RHK/JSM).**

Oct. 19, 2007.

**Background:** Pancreatic-enzyme-supplement drug
manufacturer brought action against competitors as-
serting Lanham Act claims of false advertising.
Competitors moved for judgment on the pleadings,
and to dismiss.

**Holdings:** The District Court, Richard H. Kyle, J.,
held that:
(1) manufacturer's claims were not barred by the
Food and Drug Administration's (FDA) "primary
jurisdiction,";
(2) continuing-violation doctrine did not apply to
toll statute of limitations on manufacturer's claims;
(3) application of virtual-representation doctrine
was unwarranted to bar manufacturer' claims; and
(4) manufacturer pleaded his Lanham Act claims
with the requisite specificity.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⚙➞1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in Gen-
eral
                170Ak1772 k. Insufficiency in Gener-
al. Most Cited Cases
To avoid dismissal on a motion to dismiss for fail-
ure to state a claim, a complaint must include

enough facts to state a claim to relief that is plaus-
ible on its face. Fed.Rules Civ.Proc.Rule 12(b)(6),
28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚙➞673**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak673 k. Claim for Relief in Gen-
eral. Most Cited Cases
While the general pleading rule does not require the
pleading of detailed factual allegations, a plaintiff
nevertheless must plead sufficient facts to provide
the grounds of his entitlement to relief, which re-
quires more than labels and conclusions, and for
which a formulaic recitation of the elements of a
cause of action will not do. Fed.Rules
Civ.Proc.Rule 8, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⚙➞1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in Gen-
eral
                170Ak1772 k. Insufficiency in Gener-
al. Most Cited Cases
To survive a motion to dismiss for failure to state a
claim, a complaint cannot simply leave open the
possibility that a plaintiff might later establish some
set of undisclosed facts to support recovery; rather,
the facts set forth in the complaint must be suffi-
cient to nudge the claims across the line from con-
ceivable to plausible. Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⚙➞1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in Gen-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



EXHIBIT

eral
          170Ak1772 k. Insufficiency in General. Most Cited Cases

A complaint should not be dismissed for failure to state a claim simply because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜1773**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in General
                170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases

A well-pleaded complaint will survive a motion to dismiss for failure to state a claim even if it appears that a recovery is very remote and unlikely. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Antitrust and Trade Regulation 29T ☜62**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk62 k. Exclusive and Concurrent Remedies. Most Cited Cases
                (Formerly 29Tk23)

Lanham Act claims of pancreatic-enzyme-supplement drug manufacturer brought against competitors alleged competitors engaged in false advertising by advertising their drugs as "generic equivalents to" or "substitutes for" manufacturer's drug based on the proper market definitions of those terms, rather than the Food and Drug Administration's (FDA) definition of "equivalence," and therefore manufacturer's claims were not barred by the FDA's "primary jurisdiction," as manufacturer's claims did not infringe on the FDA's right to determine whether two drugs were "equivalent" to one another based on its definition of "equivalence." Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[7] Antitrust and Trade Regulation 29T ☜71**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk70 Time to Sue; Limitations
                29Tk71 k. In General. Most Cited Cases

The Lanham Act does not contain a statute of limitations; when a Lanham-Act defendant asserts that the plaintiff's claims are barred by the statute of limitations, a court must look to the local statute which bears the closest resemblance to the Lanham Act and then apply the limitation period applicable to it. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[8] Antitrust and Trade Regulation 29T ☜71**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk70 Time to Sue; Limitations
                29Tk71 k. In General. Most Cited Cases

For Lanham-Act claims, Minnesota federal courts borrow the six-year statute of limitations in the Minnesota Statutes. M.S.A. § 541.05(2).

**[9] Limitation of Actions 241 ☜58(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k58 Liabilities Created by Statute
                241k58(1) k. In General. Most Cited Cases

"Continuing violation doctrine" did not apply to toll statute of limitations on pancreatic-enzyme-supplement drug manufacturer's Lanham Act claims alleging competitors engaged in false advertising; competitors' conduct was not the result of one incessant violation, but rather a series of repeated violations of an identical nature, namely, the competitors' repeated advertising of their drugs as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

Page 3

"generic equivalents to" and "substitutes for" manufacturer's drug. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[10] Limitation of Actions 241 ⊂⇒58(1)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k58 Liabilities Created by Statute
            241k58(1) k. In General. Most Cited Cases
There are two types of continuing violations for statute of limitations purposes: those in which a defendant's plan, practice, or procedure causes unlawful acts to occur both outside and inside the limitations period, in which case the earlier violations are not time barred, and those in which an independent and distinct violation occurring outside the limitations period is repeated within the period, in which case the earlier violation is time barred.

**[11] Judgment 228 ⊂⇒677**

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
         228k677 k. Persons Represented by Parties. Most Cited Cases
Application of virtual-representation doctrine was unwarranted to bar pancreatic-enzyme-supplement drug manufacturer' Lanham Act's claims against competitors based on another competitor's prior action; there was no evidence that the first plaintiff had a strong incentive to adequately represent manufacturer's interests in its prior litigation, that first plaintiff had substantially the same incentive to achieve the same results as manufacturer, or that manufacturer participated in the prior litigation or waited to bring its lawsuit out of concern that the first plaintiff would lose its litigation, and manufacturer's case was simply a damages claim for false advertising, and thus did not raise public-law issues. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[12] Judgment 228 ⊂⇒584**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
         228k584 k. Nature and Elements of Bar or Estoppel by Former Adjudication. Most Cited Cases
Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.

**[13] Judgment 228 ⊂⇒677**

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
         228k677 k. Persons Represented by Parties. Most Cited Cases
Under the "virtual-representation doctrine," privity with a party to a prior lawsuit may exist if the latter party's interests were adequately represented by the litigant in the earlier case, that is, if the latter party's interests are so closely aligned with the prior party's interests that the prior party was, in essence, the latter party's virtual representative.

**[14] Judgment 228 ⊂⇒677**

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
         228k677 k. Persons Represented by Parties. Most Cited Cases
There is no bright-line rule to decide when to apply the virtual-representation doctrine to establish privity; it is a fact-intensive inquiry aimed at determining whether the relationship between the party to the prior litigation and the party to the subsequent litigation is close enough.

**[15] Judgment 228 ⊂⇒677**

228 Judgment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

228XIV Conclusiveness of Adjudication
228XIV(B) Persons Concluded
228k677 k. Persons Represented by Parties. Most Cited Cases

Courts look at several factors when deciding whether to apply the virtual-representation doctrine to establish privity, including (1) identity of interests between the parties, (2) the closeness of the parties' relationship, (3) participation in the prior litigation, (4) acquiescence in the prior litigation, (5) whether the present party deliberately maneuvered to avoid the effects of the first action, (6) adequacy of representation, that is, whether the prior litigant had a strong incentive to protect the interests of the second party, and (7) whether a public-law issue or a private-law issue is raised.

**[16] Equity 150 ⬅➡67**

150 Equity
150II Laches and Stale Demands
150k67 k. Nature and Elements in General. Most Cited Cases

Laches is an equitable doctrine premised upon the same principal that underlies the statute of limitations: the desire to avoid unfairness that can result from the prosecution of stale claims.

**[17] Equity 150 ⬅➡72(1)**

150 Equity
150II Laches and Stale Demands
150k68 Grounds and Essentials of Bar
150k72 Prejudice from Delay in General
150k72(1) k. In General. Most Cited Cases

In order for laches to apply, (1) a plaintiff must have unreasonably and inexcusably delayed commencing his action and (2) the defendant must have suffered prejudice as a result.

**[18] Equity 150 ⬅➡84**

150 Equity
150II Laches and Stale Demands
150k84 k. Application of Doctrine in General. Most Cited Cases

**Federal Civil Procedure 170A ⬅➡1831**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1831 k. Fact Issues. Most Cited Cases

**Federal Civil Procedure 170A ⬅➡2465.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)1 In General
170Ak2465 Matters Affecting Right to Judgment
170Ak2465.1 k. In General. Most Cited Cases

Because a court asked to apply laches must determine the reasonableness of, and, hence, the reasons and excuses for, the plaintiff's delay in filing suit, as well as the resulting prejudice suffered by the defendant, laches generally cannot be decided on a motion for summary judgment, let alone a motion to dismiss.

**[19] Antitrust and Trade Regulation 29T ⬅➡23**

29T Antitrust and Trade Regulation
29TII Unfair Competition
29TII(A) In General
29Tk21 Advertising, Marketing, and Promotion
29Tk23 k. Particular Cases. Most Cited Cases

Pancreatic-enzyme-supplement drug manufacturer stated Lanham Act claim for false advertising against competitors by alleging competitors falsely suggested that their drugs were generic equivalent substitutes for manufacturer's drug by advertising their drugs as alternatives to manufacturer's drug and by inviting pharmacists and others to compare

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

Page 5

the labeled ingredients in their drugs with manufacturer's drug. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[20] Federal Civil Procedure 170A ⟐636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
    (Formerly 29Tk76)
Pancreatic-enzyme-supplement drug manufacturer pleaded his Lanham Act claims for false advertising against competitors with the requisite specificity by pleading the who, what, where, when, and how of its claims. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A ⟐636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Rule requiring fraud to be pleaded with particularity does not require that the exact particulars of every allegedly false instance of "false" advertising be specified in the complaint; rather, the rule is satisfied if the plaintiff's complaint sufficiently apprises the defendant of the nature of the claim and the acts relied upon by the plaintiff as constituting the unlawful conduct. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Ronn B. Kreps, Andre T. Hanson, Minneapolis, MN, Saul H. Perloff, San Antonio, TX, Marc B. Collier, Fulbright & Jaworski LLP, Austin, TX, for Plaintiff.
William Z. Pentelovitch, Martin S. Fallon, Haley N. Schaffer, Maslon Edelman Borman & Brand LLP, Minneapolis, MN, Thomas C. Morrison, Robert W. Lehrburger, John C. Knapp, Patterson Belknap Webb & Tyler LLP, New York, NY, for Defendants Ethex Corporation and KV Pharmaceutical Company.
John B. Lunseth, Briggs and Morgan, P.A., Minneapolis, MN, Claude M. Stern, Scott B. Kidman, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for Defendants Impax Laboratories, Inc. and Global Pharmaceuticals.

## MEMORANDUM OPINION AND ORDER

RICHARD H. KYLE, United States District Judge.

### INTRODUCTION

*1 The Plaintiff in this Lanham-Act action, Axcan Scandipharm, Inc. ("Axcan"), manufactures and markets the "Ultrase" line of pancreatic-enzyme-supplement drugs. Defendants Ethex Corporation ("Ethex") and KV Pharmaceutical Company ("KV") manufacture and sell a "generic" line of Ultrase called "Pangestyme." Similarly, Defendants Impax Laboratories, Inc. ("Impax") and Global Pharmaceuticals ("Global") manufacture and sell a different "generic" line of Ultrase called "Lipram." In this action, Axcan alleges that Ethex, KV, Impax, and Global have engaged in false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and Minnesota law because neither Pangestyme nor Lipram is truly a "generic equivalent" version of Ultrase. Ethex and KV now move for judgment on the pleadings, while Impax and Global move to dismiss. For the reasons set forth below, the Motions will be granted in part and denied in part.

### BACKGROUND

Since the early 1990's, Axcan has manufactured and marketed its Ultrase line of pancreatic-enzyme drugs. (Compl.¶ 1.) These drugs help patients with pancreatic insufficiencies-such as those suffering

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

from cystic fibrosis or chronic pancreatitis-who are unable to produce the enzymes necessary to break down and digest fats, proteins, and carbohydrates in the foods they eat.(*Id.* ¶¶ 18-26.)Ultrase contains those needed enzymes and comes in three formulations-Ultrase MT12, Ultrase MT18, and Ultrase MT20-which correspond to the amount of a certain pancreatic enzyme (lipase) contained in each. (*Id.* ¶ 27.)

In addition to Ultrase, there are two other major brand-name lines of pancreatic-enzyme supplements: "Creon," which is sold by Solvay Pharmaceuticals ("Solvay"), and "Pancrease," which is sold by Ortho-McNeil. Creon and Pancrease also come in different formulations, based on the amount of lipase they contain.[FN1]

In August 2000, KV began to manufacture, and Ethex began to sell, Pangestyme, an allegedly "generic equivalent" version of Ultrase, in three formulations: Pangestyme-UL12, Pangestyme-UL18, and Pangestyme-UL20. (*Id.* ¶ 35.)Likewise, in April 1999, Global and Impax began to manufacture and sell their own "generic equivalent" version of Ultrase-Lipram-in three similar formulations. (*Id.* ¶ 44.)[FN2]Axcan alleges that the Defendants advertise their pancreatic-enzyme drugs as being "identical in formulation to Ultrase" even though they contain different amounts of lipase and other pancreatic enzymes from Ultrase. (*Id.* ¶¶ 32, 46.)Axcan further alleges that the Defendants invite pharmacists and others to compare the labeled ingredients in their drugs with Ultrase, and thereby imply that those drugs are "generic equivalent substitute[s] for Ultrase," when in fact they contain different formulations. (*Id.* ¶¶ 38, 47.)Accordingly, Axcan alleges that Ethex, KV, Impax, and Global have engaged in false advertising and unfair competition, leading "pharmacists in Minnesota and across the country ... into believing that Lipram-UL and Pangestyme-UL are generic equivalents to Ultrase and [to] substitute[ ] Pangestyme-UL and Lipram-UL for Ultrase as a result."(*Id.* ¶ 61.)

**\*2** This is not the first time that such allegations

have been levied against the Defendants. In 2003, Solvay filed lawsuits in this Court against Ethex and KV ( *Solvay Pharm. v. Ethex Corp.,* Civil No. 03-2836, 2004 WL 742033 (D.Minn. March 30, 2004) (Tunheim, J.) ("*Solvay I* ")) and Impax and Global ( *Solvay Pharm. v. Global Pharm.*, 298 F.Supp.2d 880 (D.Minn.2004) (Frank, J.) (" *Solvay II* ")) alleging nearly identical claims to those asserted by Axcan here.[FN3]Impax and Global settled *Solvay II*; after almost four years of litigation, *Solvay I* resulted in a defense verdict following a six-week jury trial.[FN4]

Ethex and KV now move for judgment on the pleadings, while Impax and Global move to dismiss. In their Motion, Ethex and KV argue that (1) the Food and Drug Administration ("FDA") has "primary jurisdiction" over Axcan's claims; (2) Axcan's claims are beyond the applicable statutes of limitations; (3) Axcan's claims are barred by *res judicata;* and (4) Axcan's claims are barred by laches. Impax and Global make similar arguments in their Motion, and also assert that (1) marketing one drug as an "alternative" to another, or asking consumers to "compare" two drugs, cannot be "false advertising" as a matter of law, and (2) Axcan's claims are not pleaded with sufficient particularity under Federal Rule of Civil Procedure 9(b). In addition, Ethex and KV have adopted as their own the arguments raised by Impax and Global, and vice versa.[FN5]

## STANDARD OF REVIEW

Ethex's and KV's Motion for Judgment on the Pleadings is reviewed under the same standard as Impax's and Global's Motion to Dismiss. *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), however, the Supreme Court recently altered the legal landscape for evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[FN6]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

[1][2][3] To avoid dismissal under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.While Rule 8 of the Federal Rules of Civil Procedure does not require the pleading of "detailed factual allegations," a plaintiff nevertheless must plead sufficient facts "to provide the 'grounds' of his 'entitle[ment]' to relief,' [which] requires more than labels and conclusions, and [for which] a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citation omitted). Thus, a complaint cannot simply "le[ave] open the possibility that a plaintiff might later establish some 'set of undisclosed facts' to support recovery." *Id.* at 1968 (citation omitted). Rather, the facts set forth in the complaint must be sufficient to "nudge the[ ] claims across the line from conceivable to plausible." *Id.* at 1974.

[4][5] When reviewing a motion to dismiss, the complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Id.* at 1964-65.A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. *Id.* Accordingly, a well-pleaded complaint will survive a motion to dismiss " 'even if it appears that a recovery is very remote and unlikely.' " *Id.* at 1965 (citation omitted).

## ANALYSIS

### I. The Court enjoys subject-matter jurisdiction over Axcan's claims.

*\*3* [6] The Court begins its analysis with the Defendants' arguments concerning subject-matter jurisdiction. *See Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("Whether the complaint states a cause of action on which relief could be granted is a question of law [that] must be decided after and not before the court has assumed jurisdiction over the controversy."); *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001) (a district court "should consider [a] jurisdictional attack before addressing any attack on the merits"). The Defendants argue that the Court lacks jurisdiction over Axcan's claims because the FDA has primary responsibility for regulating pancreatic-enzyme-drug marketing.[FN7]This argument was rejected in both *Solvay I* and *Solvay II.*Rather than painting on a blank pallet, the Court will quote extensively from Judge Tunheim's succinct recitation of the controlling legal framework in *Solvay I:*

#### A. The FDCA and FDA

The primary regulatory system covering prescription drugs was created by the Food, Drug and Cosmetic Act ("FDCA").21 U.S.C. § 301-92. The FDCA requires FDA approval, through a "new drug application" ("NDA"), before a new drug may be put on the market. *Id.* at §§ 331(d), 355(a). A product similar to an NDA approved drug may be approved and marketed based on an "abbreviated new drug application" ("ANDA").*Id.* at § 355(j). An ANDA requires the manufacturer of the similar drug to demonstrate that the two drugs are therapeutically equivalent, that is pharmaceutically equivalent and bioequivalent. *Id.* at § 355(j)(2)(A)(i)-(viii).[FN8] Each year the FDA publishes Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book," listing all NDA approved drugs along with therapeutic equivalence determinations. Enforcement of the FDCA is permitted exclusively "by and in the name of the United States" or, in certain circumstances, by a state. 21 U.S.C. § 337; *see Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 231 (3rd Cir.1990) (FDA and FTC share exclusive jurisdiction over regulation of drug marketing requiring original interpretation of FDA or FTC acts or regulations).

Prescription pancreatic enzyme supplements are, like any other drug, subject to FDA regulation. In

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

Page 8

1995 the FDA declared that all pancreatic enzyme drugs would require NDA or ANDA approval, but permitted such drugs to remain on the market while the FDA fleshed out the approval process. Thus, neither Creon [Solvay's brand-name pancreatic-enzyme drug] nor Pangestyme [Ethex's and KV's "generic"] has been tested, approved, compared or otherwise passed on by the FDA, and neither is listed in the Orange Book.

### B. The Lanham Act

The Lanham Act provides a private remedy to a plaintiff who has been harmed by "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."15 U.S.C. § 1125(a)(1)(B). The Act primarily protects commercial interests of individuals. *Sandoz*, 902 F.2d at 230.In contrast to the FDCA, the Lanham Act expressly establishes a private right of action. *See*15 U.S.C. § 1125(a). Ethex markets Pangestyme to doctors, pharmacists, drug wholesalers, and drug retailers.

### C. Overlap

*4 The FDCA and the Lanham Act overlap to the extent that both regulate drug products in the marketplace. Courts have recognized the potential conflict between the two Acts and have struggled to define the proper scope of each law. Courts have come to the general conclusion that the FDA's enforcement of the FDCA is primarily concerned with the safety and efficacy of new drugs, while the Lanham Act is focused on the truth or falsity of advertising claims. *See, e.g., Sandoz*, 902 F.2d at 230.More specifically, where a claim requires interpretation of a matter that is exclusively within the jurisdiction and expertise of the FDA and FDCA, plaintiffs cannot use the Lanham Act as a backdoor to private enforcement. *Id.* at 231; *Mylan Labs., Inc. v.*

*Matkari*, 7 F.3d 1130, 1139 (4th Cir.1993). However, "false statements are actionable under the Lanham Act, even if their truth may be generally within the purview of the FDA."
*Solvay I*, 2004 WL 742033, at *2-3 (D.Minn. Mar. 30, 2004) (footnote 8 added by this Court) (citations and footnotes omitted); *see also Solvay II*, 298 F.Supp.2d 880, 883-85 (D.Minn.2004).

Here, as in *Solvay*, the Defendants argue that, by challenging their marketing of Pangestyme and Lipram as "generic equivalents to" or "substitutes for" Ultrase, Axcan has necessarily asserted that the Defendants are improperly representing their drugs as "equivalent" to Ultrase*in the FDA's sense of that term*-in other words, the Defendants understand Axcan's claims to mean that the Defendants are improperly suggesting that Pangestyme and Lipram are pharmaceutically equivalent and bioequivalent to Ultrase. (*See* Impax & Global Mem. at 8; Ethex & KV Mem. at 33-34.) According to the Defendants, whether their drugs are "equivalent" to Ultrase in such fashions can only be determined by the FDA.

The Defendants, however, misapprehend the nature of Axcan's claims. Axcan does not allege that the Defendants have falsely implied that their drugs are "equivalent" in the FDA sense-that is, bioequivalent and pharmaceutically equivalent to Ultrase. Rather, Axcan asserts that, by advertising their drugs as "generic equivalents to" or "substitutes for" Ultrase, the Defendants have engaged in false advertising based on "the proper market definition[s]" of these terms. (Mem. in Opp'n at 18.) Stated differently, Axcan seeks to proffer evidence of the *generally understood meanings* of the terms "generic equivalence" and "substitute," and not the FDA's definition of "equivalence," in order to establish the falsity of the Defendants' advertisements. Such claims in no way infringe on the FDA's right to determine whether two drugs are "equivalent" to one another based on *its* definition of "equivalence." *See Solvay I*, 2004 WL 742033, at *4 ("an FDA determination is not necessarily re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959

**(Cite as: 2007 WL 3095367 (D.Minn.))**

quired in order for two drugs to be properly considered equivalent"); *Solvay II,* 298 F.Supp.2d at 884-85.FN8Simply put, Axcan's claims do not require the Court "to determine anything within the particular jurisdiction of the FDA"; the claims do not concern "the safety and efficacy" of the Defendants' drugs, but rather "the truth or falsity of [their] advertising claims." *Solvay I,* 2004 WL 742033, at *3-4;*accord Midlothian Labs., L.L.C. v. Pamlab, L.L.C.,* No. 2:04cv836, 2007 WL 2458409, at *14 (M.D.Ala. Aug. 28, 2007) (assertion that " 'generic equivalence' is false advertising is not preempted by the FDA to the extent that [the counter-plaintiff] seeks to prove its claim with evidence that pharmacists understand 'generic equivalence' to imply therapeutic equivalence (or some other standard of equivalence), rather than with evidence that FDA regulations require therapeutic equivalence"); *Pediamed Pharms., Inc. v. Breckenridge Pharms., Inc.,* 419 F.Supp.2d 715, 725-26 (D.Md.2006).

**\*5** Recognizing that they face an uphill battle due to *Solvay I* and *Solvay II,* the Defendants argue that those decisions are no longer good law in light of two subsequent cases: *Alpharma, Inc. v. Pennfield Oil Co.,* 411 F.3d 934 (8th Cir.2005), and *Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264, 127 S.Ct. 2383, 168 L.Ed.2d 145 (2007). Neither *Alpharma* nor *Credit Suisse,* however, aids the Defendants' cause.

In *Alpharma,* the plaintiff alleged that the defendant had violated the Lanham Act by advertising its antibiotic as approved for certain uses by the FDA, even though it had not been so approved. The district court dismissed the action based on the FDA's primary jurisdiction, but the Eighth Circuit reversed. The court held that the plaintiff's claim-that the defendant was improperly advertising that its product "*has* been approved as safe and effective"-turned simply on the truth or falsity of that assertion, and was much different from determining whether the defendant's product "*should be* approved as safe and effective," which was within the

exclusive province of the FDA. 411 F.3d at 939 (emphases added). Since the plaintiff's claim turned only on the veracity of the defendant's advertising-*i.e.,* had the drug actually been proved safe and effective?-the court held that the claim was not barred. *Id.* Similarly, the issue here is not whether the FDA should deem the Defendants' products to be "generic" versions of Ultrase; rather, the issue is whether, by advertising and marketing those products as "generic equivalents to" or "substitutes for" Ultrase when they do not contain the same ingredients, the Defendants' advertising is literally or implicitly false, based on commonly understood meanings of "equivalent" and "substitute." Nothing in *Alpharma* bars such a claim.

In *Credit Suisse,* the Supreme Court held that federal antitrust law must yield to federal securities law-in particular, regulations issued by the Securities and Exchange Commission ("SEC")-where the two are "clearly incompatible." 127 S.Ct. at 2392.The Court identified several factors used to determine whether the SEC's regulatory scheme precluded application of the antitrust laws, one of which is whether there exists a "serious conflict between the antitrust and regulatory schemes." *Id.* at 2397.According to the Defendants, *Credit Suisse* teaches that Axcan's Lanham-Act claims must yield to the FDA's regulatory scheme concerning generic drugs, but this Court does not agree.

*Credit Suisse* does not break any new ground, at least in the Lanham-Act context FN10-indeed, *Solvay I* and *Solvay II* each noted that federal courts have long struggled to resolve the interplay between the FDA's and the Lanham Act's regulation of drug marketing. Moreover, even if *Credit Suisse* somehow "heralds sweeping changes to existing precedent" (Mem. in Opp'n at 24), its holding would still be inapposite because there is no "serious conflict" between the FDA's regulations and Axcan's claims here. 127 S.Ct. at 2397.As discussed above, the claims in this case focus on the truth or falsity of the Defendants' advertising that their pancreatic-enzyme drugs are, among other

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

Page 10

things, "generic equivalents to" or "substitutes for" Ultrase, based on commonly understood meanings of those terms. Such claims can be maintained in this Court without infringing on the FDA's right to determine whether the Defendant's drugs are "generic" versions of Ultrase under its own definition of "equivalence." Simply put, there is no conflict here.[FN11]

*6 Accordingly, Axcan's claims are not barred by the FDA's "primary jurisdiction."

## II. The statute of limitations bars claims for conduct occurring prior to June 1, 2001.

[7][8] The Lanham Act does not contain a statute of limitations. When a Lanham-Act defendant asserts that the plaintiff's claims are barred by the statute of limitations, a court must "look to the local statute which bears the closest resemblance to the [Lanham Act] and then apply the limitation period applicable to it." *Fox Chem. Co. v. Amsoil, Inc.,* 445 F.Supp. 1355, 1358-59 (D.Minn.1978) (Devitt, J.) (citations omitted); *accord Island Insteel Sys., Inc. v. Waters,* 296 F.3d 200, 206 (3rd Cir.2002). For Lanham-Act claims, Minnesota federal courts borrow the six-year statute of limitations in Minnesota Statutes Section 541.05(2).*See Lens-Crafters, Inc. v. Vision World, Inc.,* 943 F.Supp. 1481, 1491 n. 6 (D.Minn.1996); *Fox Chem.,* 445 F.Supp. at 1358.[FN12]Similarly, Axcan's state-law claims also are subject to a six-year statute of limitations. *See, e.g., Klehr v. A.O. Smith Corp.,* 875 F.Supp. 1342, 1352-53 (D.Minn.1995).

[9][10] There is no dispute that some of the conduct challenged by Axcan occurred prior to June 1, 2001 (six years prior to the date the Complaint was filed). (*See* Mem. in Opp'n at 34.) [FN13]Nevertheless, Axcan argues that it can seek relief based on that conduct, relying on the "continuing-violation" doctrine. There are two types of continuing violations: those in which a defendant's plan, practice, or procedure causes unlawful acts to occur both outside and inside the limitations period (in which case

the earlier violations are not time barred), and those in which an independent and distinct violation occurring outside the limitations period is repeated within the period (in which case the earlier violation is time barred).*See, e.g., Mandy v. Minn. Mining & Mfg.,* 940 F.Supp. 1463, 1468 (D.Minn.1996). Axcan attempts to shoehorn the Defendants' conduct into the first type of continuing violation, and hence, argues that Defendants' allegedly false advertising before June 1, 2001 is actionable. The Court does not agree.[FN14]

"The term 'continuing violation' ... implies that there is but one incessant violation and that the plaintiff[ ] should be able to recover for the entire duration of the violation, without regard to the fact that it began outside the statute of limitations window." *Knight v. Columbus, Ga.,* 19 F.3d 579, 582 (11th Cir.1994). Here, however, the challenged conduct was not the result of "one incessant violation," but rather was a "series of repeated violations of an identical nature," namely, the Defendants' repeated (false) advertising of their drugs as "generic equivalents to" and "substitutes for" Ultrase. *Id.* (continuing-violation doctrine not applicable to repeated failure to pay overtime to employees, since each failure constituted a new violation); *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period"); *Pioneer Co. v. Talon, Inc.,* 462 F.2d 1106, 1108 (8th Cir.1972) ("each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ... the statute of limitations runs from the commission of the act").

*7 Moreover, the first type of continuing violation typically concerns an unlawful practice or procedure-*Knight's* so-called "incessant violation"-that spawns specific unlawful acts, such as a hostile work environment. *See, e.g., Morgan,* 536 U.S. at 120-21, 153 L.Ed.2d 106; *Derrick Mfg. Corp. v. Sw. Wire Cloth, Inc.,* 934 F.Supp. 796, 808

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

(S.D.Tex.1996) ("These claims are such that later violations are inseparable from the earlier ones and thus are all deemed a single wrong."). In such a situation, it is the policy that is unlawful, but neither the policy nor its unlawfulness becomes evident until specific unlawful acts caused by the policy have been repeated several times. *See Morgan,* 536 U.S. at 120 & n. 12, 122 S.Ct. 2061.Here, however, with each (allegedly) false advertisement, the Defendants' illegal conduct was manifest and Axcan could have sued; "where each [instance of wrongful conduct] is separate, distinct, and could have been challenged by a plaintiff, the continuing [violation] doctrine does not apply." *Hope v. Klabal,* 457 F.3d 784, 793 (8th Cir.2006). Axcan has cited no Lanham-Act cases applying the first type of continuing violation, and the Court has found none.

Accordingly, the Court concludes that Axcan's claims are time barred insofar as they challenge conduct occurring prior to June 1, 2001.

### III. It is too early to decide whether *res judicata* applies.

[11][12] The Defendants next argue that Axcan's claims are barred by *res judicata* due to the defense verdict in *Solvay I.*"Under the doctrine of *res judicata,* a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Daley v. Marriott Int'l, Inc.,* 415 F.3d 889, 895-96 (8th Cir.2005). Although the claims here parallel the claims in *Solvay I,* Axcan was not a party to that action. *Res judicata,* therefore, bars Axcan's claims only if it is "in privity" with Solvay.

[13][14] The Defendants rely on the "virtual-representation" doctrine to argue that Axcan is in privity with Solvay. Under that doctrine, privity with a party to a prior lawsuit may exist if the latter party's interests were "adequately represented" by the litigant in the earlier case-that is, if the latter party's interests are "so closely aligned" with the prior party's interests that the prior party

was, in essence, the latter party's "virtual representative." *Tyus v. Schoemehl,* 93 F.3d 449, 454 (8th Cir.1996) (quoting *Aerojet-Gen. Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.1975)). There is no bright-line rule to decide when to apply the "virtual-representation" doctrine; it is a fact-intensive inquiry aimed at determining whether the relationship between the party to the prior litigation and the party to the subsequent litigation is "close enough." *Id.* at 455 (quoting *Gerrard v. Larsen,* 517 F.2d 1127, 1134 (8th Cir.1975)). This fact alone suggests that it would be inappropriate to dismiss Axcan's claims, at this early stage of the litigation and on an undeveloped factual record, based on Solvay's purported "virtual representation" of Axcan. *See, e.g., EEOC v. Pemco Aeroplex, Inc.,* 383 F.3d 1280, 1287 (11th Cir.2004) ("Whether or not a party is a virtual representative of another is a question of fact.").

**\*8** [15] In any event, courts look at several factors when deciding whether to apply the virtual-representation doctrine, including (1) identity of interests between the parties, (2) the closeness of the parties' relationship, (3) participation in the prior litigation, (4) acquiescence in the prior litigation, (5) whether the present party "deliberately maneuvered" to avoid the effects of the first action, (6) "adequacy of representation," that is, whether the prior litigant had a "strong incentive" to protect the interests of the second party, and (7) whether a public-law issue or a private-law issue is raised. *Id.* at 455-56 (citations omitted). Despite the Defendants' best efforts to convince the Court otherwise, and although at least some of these factors appear to weigh in the Defendants' favor, at the present juncture the Court is not persuaded that these factors mandate the dismissal of Axcan's claims.

First, there is no basis for the Court to conclude that Solvay had a "strong incentive"-or any incentive at all-to "adequately represent" Axcan's interests in its prior litigation against the Defendants. Axcan and Solvay are competitors in the pancreatic-enzyme-drug market and, hence, their interests are not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

necessarily aligned. *See Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1405-06 (9th Cir.1993) (holding that one company did not virtually represent another company in prior litigation, even though their interests were aligned, when there was "no indication that [the first company] had any interest in [the second company's] affairs or well-being during or after [its] lawsuit").[FN15] By the same token, it is difficult to conceive that Axcan and Solvay have a "close relationship" when they compete in the same market. *Cf. Tyus,* 93 F.3d at 457 (close relationship existed when second action involved some of the same plaintiffs as earlier action and all plaintiffs were St. Louis alderman suing to challenge aldermanic re-districting).[FN16] At this early stage of the proceedings, the Court simply does not have an adequate record upon which to determine whether Solvay's and Axcan's interests are aligned.

Second, even if it can be said that Solvay and Axcan share an identity of interests, that alone is not sufficient. *Id.* at 455.Rather, "it is necessary to show not just that [Solvay and Axcan] wanted the same results but also that [Solvay] had substantially the same incentive to achieve it." *Taylor v. Blakey,* 490 F.3d 965, 972 (D.C.Cir.2007). At this motion-to-dismiss stage, there is no evidence before the Court upon which it could make such a determination. *Cf. id.*(at summary judgment, concluding that evidence demonstrated identity of interests and incentive to protect those interests).

Third, there is no evidence that Axcan participated in *Solvay*[FN17] or that it waited to bring this lawsuit out of a concern that Solvay would lose its litigation and, hence, "deliberately maneuvered" to avoid the effects of *Solvay I. See Pemco,* 383 F.3d at 1288 (deliberate maneuvering means "maneuvering to avoid preclusion").[FN18] Nor is there any evidence indicating that Axcan "acquiesced" in Solvay's litigation against the Defendants or agreed to be bound by the judgment obtained in *Solvay I. See*Restatement (Second) of Judgments § 40 cmt. b (1982 & Supp.2007) (no agreement to be bound by judgment should be inferred "except upon the plainest

circumstances").

*9 Finally, the claims in this case do not, as the Defendants argue, raise public-law issues. The Defendants assert that the purported "false" advertising of their drugs raises a public interest because it calls into question "the safety and efficacy of pancreatic enzymes."(Ethex & KV Reply at 4-5.) However, what Axcan asserts in this case is simply a damages claim for false advertising, a mere "private right shared not in common with the public." *Tyus,* 93 F.3d at 457.Stated differently, an endless number of possible plaintiffs alleging the same claims as Axcan (and Solvay) do not exist. Rather, only a finite and limited number of entities may claim Lanham-Act damages as a result of the Defendants' allegedly false advertising. The claims, therefore, are private. *Id.*

For these reasons, the Court concludes that application of the virtual-representation doctrine is unwarranted at this time. Accordingly, the Motions must be denied on this ground.

**IV. The Court cannot decide at this juncture whether laches bars Axcan's claims.**

The Defendants next argue that Axcan's claims are barred by laches, because "[n]ot only did Axcan wait seven years to challenge [the Defendants'] marketing [practices], it sat on the sidelines for four years while its attorney prosecuted an identical lawsuit ... on behalf of an identically situated plaintiff." (Ethex & KV Mem. at 21.) At this stage of the litigation, the Court cannot agree.

[16][17][18] Laches is an equitable doctrine "premised upon the same principal that underlies the statute of limitations: the desire to avoid unfairness that can result from the prosecution of stale claims." *Midwestern Mach. Co. v. NW Airlines, Inc.,* 392 F.3d 265, 277 (8th Cir.2004). In order for laches to apply, (1) a plaintiff must have unreasonably and inexcusably delayed commencing his action and (2) the defendant must have suffered preju-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

Page 13

dice as a result. *Id.* (quoting *Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 804 (8th Cir.1979)). Because a court asked to apply laches must determine the reasonableness of-and, hence, the reasons and excuses for-the plaintiff's delay in filing suit, as well as the resulting prejudice suffered by the defendant, laches generally cannot be decided "on a motion for summary judgment, let alone a motion to dismiss." *United States v. Portrait of Wally,* No. 99-Civ.-9940, 2002 WL 553532, at *22 (S.D.N.Y. Apr. 12, 2002); *accord, e.g., Kling v. Hallmark Cards, Inc.,* 225 F.3d 1030, 1041 (9th Cir.2000) ("because a claim of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment") (internal quotation marks omitted); *Jeffries v. Chicago Transit Auth.,* 770 F.2d 676, 679 (7th Cir.1985); *Goldberg v. Cameron,* 482 F.Supp.2d 1136, 1152 (N.D.Cal.2007); *see also Azalea Fleet, Inc. v. Dreyfus Supply & Mach. Corp.,* 782 F.2d 1455, 1458 n. 2 (8th Cir.1986) (noting the "fact-bound nature of the laches issue").[FN19]

*10 Here, the Court concludes that it is not in a position, at this time, to opine on the merits of the Defendants' laches defense. Axcan makes several arguments concerning the reasons for its delay-such as its purported efforts to convince the Defendants to cease their "false" advertising-that go beyond the pleadings. Axcan must be afforded the opportunity to develop and present evidence on these issues. Moreover, prejudice cannot exist here unless the Defendants "ha[ve] changed [their] position[s] in a way that would not have occurred if [Axcan] had not delayed." *Goodman,* 606 F.2d at 809 n. 17.In other words, if the Defendants' conduct would have been the same regardless of whether Axcan sued earlier, then they cannot demonstrate any "change" in their position as a result of Axcan's delay and, hence, they cannot demonstrate prejudice. According to Axcan, that is precisely the case, as evidenced by Defendants continuing their allegedly false advertising after having been sued by Solvay. (Mem. in Opp'n at 39-40.) Once again, the Court is

not in a position to answer whether the Defendants would have changed their (allegedly) improper advertising had Axcan commenced suit earlier; they are entitled to obtain discovery on this issue. Finally, Axcan may be able to defeat the application of laches if it is able to show that the Defendants' conduct was willful or that they intended to engage in false advertising. *See, e.g., Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 956-57 (9th Cir.2001); *Deere & Co. v. MTD Holdings, Inc.,* 70 U.S.P.Q.2d 1009, 1027 (S.D.N.Y.2004). As before, Axcan is entitled to discover facts that would support such an argument.

Accordingly, the Court will not dismiss Axcan's claims on the ground of laches.[FN20]

**V. To the extent that Axcan's claims are based on "compare to" and "alternative to" advertising, the claims may stand.**

[19] In addition to alleging that the Defendants have engaged in false advertising because they market their drugs as "identical in formulation to Ultrase," Axcan also alleges that the Defendants have falsely suggested that their drugs are "generic equivalent substitute[s] for Ultrase" by advertising their drugs as "alternative[s] to" Ultrase and by "invit[ing] pharmacists and others to compare the labeled ingredients in their drugs with Ultrase."(Compl. ¶¶ 38, 47.) To the extent that Axcan's claims are based on such "comparative" and "alternative" advertising, the Defendants argue that the claims fail as a matter of law. The Court does not agree.

The Defendants posit that comparative advertising is legal and, as a result, that "the Lanham Act cannot be used to prevent an advertiser from referring to its product as an 'alternative' to a competitor's product or from inviting consumers to 'compare' the two products."(Impax & Global Mem. at 18.) Yet, several courts have held that advertisements inviting consumers to "compare" one product to another can be misleading in context.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

**\*11** For example, in *Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.,* the defendant manufactured a dietary supplement called "Body Solutions," and the plaintiff marketed a competing supplement whose label stated "Compare to Body Solutions." The defendant brought a counterclaim against the plaintiff for false advertising under the Lanham Act, and the plaintiff moved to dismiss, arguing that its label could not amount to false advertising as a matter of law. The court rejected that argument, stating:

> In order to form the base of a false advertising claim, the offending statement must be "either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context."Accordingly, "bald assertions of superiority or general statements of opinion" do not result in a [Lanham Act] violation. Similarly, statements that are "exaggerated advertising, blustering and boasting upon which no reasonable buyer would rely" are more properly considered "puffery" and are not actionable under the Lanham Act's false advertising provision. Other sources have described puffery as "a general claim of superiority over a comparative product that is so vague, it would be understood as a mere expression of opinion."

Plaintiff maintains that the "Compare to Body Solutions" statement on its own product does not make a detailed or specific assertion of measurable fact. As such, Plaintiff contends that the statement Defendants complain of is merely non-actionable "puffery." The court disagrees. This is not an instance where the alleged false advertising claims are broad assertions of superiority in the field. Instead, by referencing a particular competing product, that is, the Body Solutions line, Plaintiff's invitation to "compare" does not qualify as a vague claim of superiority. *Unlike more subjective terms often used in advertising, "compare" suggests that a product's performance has in fact been tested and verified. Although "Compare to Body Solutions" by itself is* not a false statement, Defendant alleges that the statement is misleading in that it leads consumers to believe that Plaintiff's products have been tested and are equivalent in efficacy or content with the Body Solutions line when they in fact are not.

202 F.Supp.2d 431, 435-36 (M.D.N.C.2002) (emphasis added) (citations omitted); *see also Clorox Co. P.R. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 37 (1st Cir.2000) (advertisement inviting consumers "Compare to your detergent ... Whiter is not possible" actionable as false advertising under Lanham Act); *Cartier, Inc. v. Deziner Wholesale, L.L.C.,* No. 98-Civ.-4947, 2000 WL 347171, at \*4-5 (S.D.N.Y. Apr. 3, 2000) (denying summary judgment on false-advertising claim where label on defendant's product invited consumers to compare prices, quality, and style with plaintiff's product). Similarly, Axcan alleges in this case that by inviting pharmacists and others to "compare" the Defendants' pancreatic-enzyme drugs to Ultrase, they falsely suggest that the drugs are equivalent in efficacy or ingredients. (Compl. ¶¶ 38, 47.)

**\*12** Courts have also held that advertising one product as an "alternative to" another may violate the Lanham Act. In *Healthpoint, Ltd. v. Ethex Corp.,* Civil No. SA-01-CA-646, 2004 WL 2359420 (W.D.Tex. July 14, 2004), for example, the court held that Ethex's advertising of its wound-debridement ointment as an alternative to the plaintiff's competing ointment was actionable because it could suggest that the two products had the "same active ingredients in the same quantities." *Id.* at \*16.*Solvay I* reached the same conclusion. *See Solvay Pharms. v. Ethex Corp.,* 2006 WL 738095, at \*3 (D.Minn. Mar. 22, 2006). Following those rulings here, Axcan can succeed on its "alternative to" claims if it can prove that the Defendants' advertising suggests that Pangestyme and Lipram contain the same ingredients, in the same quantities, as Ultrase, when in fact they do not. (Compl. ¶¶ 37-38, 46-47.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

Accordingly, Axcan may proceed with its false-advertising claims based on the Defendants' "compare to" and "alternative to" advertising.

## VI. Axcan's claims are sufficiently pleaded.

[20] Finally, the Defendants argue that Axcan's claims are not pleaded with the requisite specificity under Federal Rule of Civil Procedure 9(b). This argument lacks merit.

As an initial matter, it is not entirely clear that Rule 9(b)'s strictures apply to Lanham-Act claims. As Axcan points out in its response, there is a split of authority on this issue. *Compare, e.g., Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 709 (N.D.Ill.2006) ( "Claims that allege ... false advertising under the Lanham Act are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b).") *with John P. Villano, Inc. v. CBS, Inc.,* 176 F.R.D. 130, 131 (S.D.N.Y.1997) ("a claim of false advertising under [the Lanham Act] falls outside the ambit of Rule 9(b) and may not be subject of any heightened pleading requirement"); *see also Nutrition & Fitness, Inc.,* 202 F.Supp.2d at 434 (recognizing that several district courts have applied heightened pleading requirement but that no appellate court had opined on the propriety of doing so). Indeed, the *Villano* court articulates several persuasive reasons why Lanham-Act claims should not be subject to any pleading-with-particularity rule. *See* 176 F.R.D. at 131.

[21] In any event, assuming *arguendo* that a heightened pleading requirement applies to Axcan's claims, the Court concludes that such requirement has been satisfied here. Rule 9(b) does not require that the exact particulars of every allegedly instance of "false" advertising be specified in the Complaint. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Civ.2d* § 1297 (3rd ed.2007). Rather, that Rule is satisfied if the plaintiff's complaint sufficiently apprises the defendant "of the nature of the claim and the acts ... relied upon by the plaintiff" as constituting the un-

lawful conduct. *Id.; accord Commercial Prop. Inv., Inc. v. Quality Inns Int'l, Inc.,* 61 F.3d 639, 644 (8th Cir.1995). The Complaint here clearly apprises the Defendants of the acts relied upon by Axcan in support of its claims. Stated differently, Axcan has pleaded the "who [the Defendants], what [false advertising], where [in ads targeted to drug databases, wholesalers, and pharmacies], when [since the late 1990's], and how [falsely claiming their drugs are generic equivalents or substitutes]" of its claims. *Great Plains Trust Co. v. Union Pac. R. Co.,* 492 F.3d 986, 995 (8th Cir.2007). The sheer length and breadth of the Defendants' Memoranda indicate that they have been fully apprised of the nature of Axcan's claims and can adequately prepare responses thereto. *Solvay II* involved claims pleaded in similar fashion, *see* 298 F.Supp.2d at 885-86, and the Court reached the same conclusion; this Court perceives no reason to deviate from that ruling.

## CONCLUSION

*13 Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants Ethex's and KV's Motion for Judgment on the Pleadings (Doc. No. 33) and Defendants Impax's and Global's Motion to Dismiss (Doc. No. 41) are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Motions are **GRANTED** to the extent that they argue that claims for conduct occurring before June 1, 2001, are barred by the statute of limitations, and claims based on such conduct are **DISMISSED WITH PREJUDICE;** and

2. In all other respects, the Motions are **DENIED.**

> FN1. Although Ultrase, Creon, and Pancrease all come in formulations containing the same amount of lipase, they differ in that they contain unique amounts of other pancreatic enzymes (amylase and protease). (Compl. ¶ 30 & n. 3.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

FN2. According to the Complaint, Ethex is a wholly-owned subsidiary of KV and is responsible for marketing KV's "generic" drugs. (Compl.¶ 9.) Similarly, Global is Impax's "generic marketing division" and Impax "controls and directs" Global's operations. (*Id.* ¶ 11.)

FN3. It is unclear why this case and the *Solvay* cases were commenced in Minnesota. Axcan is headquartered in Alabama, Solvay is headquartered in Georgia, KV and Ethex are headquartered in Missouri, Impax is headquartered in California, and Global is headquartered in Pennsylvania. Because the alleged false advertising and unfair competition occurred nationwide, the Defendants are subject to personal jurisdiction and venue in any of the 50 states. Accordingly, one would expect Axcan and Solvay to file their lawsuits in their home forums and not Minnesota, which has no obvious connection to the parties or the claims.

FN4. Solvay's lead counsel, Saul Perloff of the law firm Fulbright & Jaworski LLP, represents Axcan in this case.

FN5. Pursuant to Local Rule 7.1(c), a party filing a dispositive motion is limited to a total of 12,000 words between its opening memorandum *and* its reply memorandum. By adopting the arguments made by the other Defendants in their moving papers, all of the Defendants have violated the spirit, if not the letter, of this Local Rule.

FN6. The Court pauses to note that Ethex and KV previously moved for judgment on the pleadings and, in support of that Motion, submitted a plethora of documents outside the pleadings. Ethex and KV then moved to withdraw their Motion. The Court granted the Motion to Withdraw and, at that time, advised Ethex and KV that

matters outside the pleadings are not appropriately considered by the Court when resolving such a motion. (*See* July 27, 2007 Order (Doc. No. 32) at 2 n. 1.)

In their re-filed Motion for Judgment on the Pleadings, Ethex and KV apparently ignored the Court's warning; they have once again submitted a large number of documents beyond the pleadings in support of their Motion. The Court declines to consider those documents. *See* Fed.R.Civ.P. 12(c). Regardless, most of the issues raised in Ethex's and KV's Motion are purely legal matters, which are unaffected by the documents Ethex and KV have submitted.

Taking a slightly different tack, Impax and Global have asked the Court to take judicial notice of the Complaints filed in *Solvay I* and *Solvay II*, the docket sheet in *Solvay II*, and a webpage from the Food and Drug Administration. (Doc. No. 43.) Insofar as these are all matters appropriate for judicial notice, that request is **GRANTED.** *See Great Plains Trust Co. v. Union Pac. R.R. Co.,* 492 F.3d 986, 995-96 (8th Cir.2007) (court may take judicial notice of proceedings in other cases, as well as agency documents). Nevertheless, these matters are of limited assistance to the Court in connection with the instant Motions.

FN7. The Defendants label this argument differently, with Ethex and KV asserting that Axcan's claims fall within the FDA's exclusive jurisdiction (Ethex & KV Mem. at 31-44), while Impax and Global assert that the claims are "precluded" by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (Impax & Global Mem. at 5-18). Despite the semantic differences, it is clear that these arguments are one-and-the-same. (*Compare* Ethex & KV

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
(Cite as: 2007 WL 3095367 (D.Minn.))

Mem. at 34 ("If Ethex is unlawfully marketing Pangestyme as a generic, that is a matter for the FDA, not a private litigant.") *with* Impax & Global Mem. at 7-8 ("Axcan's complaint is that Impax may not lawfully market or sell Lipram as a generic version of ... Ultrase.... That, however, is a matter that falls squarely within the primary jurisdiction of the FDA and, as a matter of law, cannot be the subject of a private right of action.").)

FN8. Two drugs are considered "pharmaceutically equivalent" if they have the same active ingredients, strength, and dosage, while two drugs are considered "bioequivalent" if they do not have significantly different rates and extent of absorption in the body. *See* 21 C.F.R. § 320.1(c), (e); Preface to the Twenty-Second Edition, *Approved Drug Products with Therapeutic Equivalence Evaluations*, available at http:// www.fda.gov/cder/orange/adppreface.htm.

FN9. This is not to say that Axcan cannot use the FDA's definitions of bioequivalence or pharmaceutical equivalence when seeking to prove its claims. The FDA's "primary jurisdiction" does not prohibit a plaintiff from relying on the FDA's definitions "merely to establish the standard [that the] defendants allegedly failed to meet." *Solvay I*, 2004 WL 742033, at *4 (quoting *Grove Fresh Distribs., Inc. v. Flavor Fresh Foods, Inc.*, 720 F.Supp. 714, 716 (N.D.Ill.1989)); *accord Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 939 (8th Cir.2005) (Lanham-Act claim may proceed even when it "turns on the meaning of [FDA] publications in the Federal Register and Code of Federal Regulations").

The Defendants argue that, in *Solvay I*, Solvay sought to prove its claims not by pointing to Ethex's and KV's advertising, but rather by arguing that Pangestyme could not be marketed as a "generic" version of Creon without a determination that Pangestyme meets *the FDA's* definition of "generic." (Ethex & KV Mem. at 31.) Assuming *arguendo* that the Defendants' description of Solvay's arguments is correct and that those arguments somehow infringed on the FDA's "primary jurisdiction," that would pose no hurdle to Axcan's claims here. Just because Solvay may have attempted to prove its claims in a certain fashion does not mean that Axcan will seek to replicate Solvay's methods of proof in this case, notwithstanding that Axcan is represented by the same counsel as Solvay.

FN10. The Court's research has failed to unearth any cases applying *Credit Suisse* to Lanham-Act claims.

FN11. Axcan also alleges a claim that was not alleged in *Solvay*: that the Defendants advertise their drugs as meeting the quality standards promulgated by the United States Pharmacopeia (USP) when in fact they do not. (Compl.¶¶ 40, 49, 64-65.) Clearly, a claim alleging that such advertising is false does not turn on the safety or efficacy of the Defendants' drugs, but rather turns on whether the Defendants' drugs do, in fact, meet USP standards. As with Axcan's other Lanham-Act claims, therefore, the claims based on such advertising are not preempted by the FDA's primary jurisdiction.

FN12. Claims under the Lanham Act-whether for damages or for injunctive relief-are subject "to the principles of equity." 15 U.S.C. §§ 1116(a), 1117(a). As a result, some courts and commentators have questioned whether Lanham-Act claims are subject to a laches defense, and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959

**(Cite as: 2007 WL 3095367 (D.Minn.))**

not a statute-of-limitations defense, since the Lanham Act contains no limitations period and "[l]aches [is] an equitable defense [while] the statute of limitations [is] a creature of law." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002); *see also id.* at 836-37 (collecting cases). Because all parties here agree that Axcan's Lanham-Act claims are subject to a statute of limitations (*see* Impax & Global Mem. at 21; Ethex & KV Mem. at 18-19; Axcan Opp. at 32), the Court need not opine on this issue.

FN13. While the Complaint is dated May 31, 2001, it was filed on June 1, 2001.

FN14. Axcan also argues that the Court need not decide "at this early date" which type of continuing-violation theory applies to the Defendants' conduct. (Mem. in Opp'n at 32-34 (describing the issue as "academically interesting but premature" because it relates only to Axcan's potential damages).) Demarcating which advertisements are actionable, however, will narrow the issues for discovery and ultimately help to streamline the trial in this case. As evidenced by the *Solvay* cases, discovery in this case is likely to be both time-consuming and expensive. Paring down the scope of discovery, therefore, will be beneficial.

FN15. By way of example here, Solvay may have been litigating against the Defendants in an attempt to strengthen its share of the pancreatic-enzyme market, to Axcan's potential detriment. *See Kourtis v. Cameron,* 419 F.3d 989, 997 (9th Cir.2005) ("a conflict of interest between a non-party and his purported representative forecloses the possibility of privity").

FN16. The Defendants point out that Axcan and Solvay have engaged the same

counsel, but "use of the same counsel in itself is hardly dispositive" of whether a close relationship exists. *Taylor v. Blakey,* 490 F.3d 965, 974 (D.C.Cir.2007) (citing *S. Cent. Bell Tel. Co. v. Alabama,* 526 U.S. 160, 167-68, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999)).

FN17. The Defendants argue that Axcan could have sought to intervene in *Solvay* (Ethex & KV Mem. at 30), and that this fact militates in favor of applying the virtual-representation doctrine. In fact, just the opposite is true. As the court noted in *People Who Care v. Rockford Board of Education:*

> *Res judicata* cannot bar [a party's] claim ... unless [his] legal interests are so closely aligned with one or more of the parties that they are at least his virtual representatives. However, if he is so closely aligned with one or more of the parties that they are his virtual representatives, then his concerns have certainly received adequate representation. And, if his interests are represented, he need not intervene; in fact, he cannot intervene unless he lacks adequate representation by the existing parties. *Thus if [the party] may intervene because he lacks sufficient representation, then there is no privity and res judicata will not bar his claim.*

68 F.3d 172, 177 (7th Cir.1995) (second emphasis added) (citations omitted). In any event, it is well-settled that "[t]he law does not impose upon any person ... the burden of voluntary intervention in a suit to which he is a stranger." *Richards v. Jefferson County,* 517 U.S. 793, 800 n. 5, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

FN18. *Taylor* noted that filing a lawsuit

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959
**(Cite as: 2007 WL 3095367 (D.Minn.))**

immediately after a prior plaintiff's case was resolved in favor of the same defendant (as here) *could* be evidence of deliberate maneuvering "to obtain multiple bites of the litigatory apple." 490 F.3d at 975-76.Yet, such timing is not automatically susceptible to a nefarious inference; the timing of the later suit could have occurred by happenstance or for other perfectly legitimate reasons. *See id.*Accordingly, the *Taylor* court did not consider this factor as weighing in favor of, or against, applying the virtual-representation doctrine. Here, at the motion-to-dismiss stage, Axcan is entitled to the benefit of the doubt on this issue.

FN19. The Defendants correctly note that some courts have applied laches at the motion-to-dismiss stage. (*See*Ethex & KV Reply at 2 (citing cases).) The greater weight of authority, however, holds that a laches defense can be resolved, if at all, only on a motion for summary judgment.

FN20. The parties make several additional arguments concerning laches, such as whether it may bar a Lanham-Act claim for damages (as opposed to injunctive relief) and whether, and in what circumstances, a presumption of laches may apply. Because the Court concludes that the applicability of laches cannot be addressed in the current procedural posture of this case, it need not wade into these arguments at this time.

D.Minn.,2007.
Axcan Scandipharm Inc. v. Ethex Corp.
--- F.Supp.2d ----, 2007 WL 3095367 (D.Minn.), 2007-2 Trade Cases P 75,959

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THERMAL DESIGN, INC.,

       Plaintiff,

      v.                               Case No. 07-C-765

AMERICAN SOCIETY OF HEATING,
REFRIGERATING and
AIR-CONDITIONING ENGINEERS, INC.,

       Defendant.

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

---

### I. BACKGROUND

On April 25, 2008, I granted defendant American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc.'s ("ASHRAE") motion to dismiss the original complaint in this action. Subsequently, on May 9, 2008, plaintiff Thermal Design, Inc. ("Thermal Design") filed an amended complaint. Thereafter, on May 21, 2008, ASHRAE filed a motion to dismiss the amended complaint. Thermal Design has filed its response to that motion, and ASHRAE has filed its reply. Accordingly, the motion is fully briefed and ready for resolution.

In its amended complaint, Thermal Design asserts claims under Wisconsin's Deceptive Trade Practices Act ("DTPA"), Wis. Stat. § 100.18; under Wisconsin common law for unfair competition; and under the Lanham Act, 15 U.S.C. § 1125(a). The amended complaint alleges the following facts, which are material to the resolution of this motion.[1]

**EXHIBIT**

E

---

[1] In addressing the defendant's motion to dismiss the amended complaint, the court considers only those facts set forth in the amended complaint and not those only alleged in the original complaint.

Thermal Design is a Nebraska corporation with its corporate headquarters in Stoughton, Wisconsin. (Am. Compl. ¶ 3.) Thermal Design is engaged in the business of developing and providing insulation systems for large non-residential metal buildings. Thermal Design's primary product line consists of ceiling and wall insulation systems wherein large sheets of polymer fabric are used as a primary component to hold fiberglass and other types of insulation between and below the structural members of a building's roof and walls with minimal compression for energy conservation. (Am. Compl. ¶ 4.)

ASHRAE is a New York corporation with its principal place of business located in Atlanta, Georgia. ASHRAE refers to itself as the global leader and the foremost source of technical and educational information in the arts and sciences of heating, ventilating, air-conditioning, and refrigerating. (Am. Compl. ¶ 5.)

ASHRAE publishes and distributes within Wisconsin several trade related publications, including *90.1-2007 Energy Standard for Buildings Except Low-Rise Residential Buildings* ("Standard"). (Am. Compl. ¶ 6.) Pursuant to the Energy Policy Act of 1992, the Standard has been adopted as the minimum standard for energy efficiency in commercial buildings. (Am. Compl. ¶ 7.) Contained within the Standard is Appendix A, entitled "Rated R-Value of Insulation and Assembly U-Factor, C-Factor, and F-Factor Determinations" ("Appendix A"). (Am. Comp. ¶ 6.) The Standard and Appendix A contain an installation methodology recommended by ASHRAE ("Methodology") for use in installing metal building roof and wall insulation assemblies ("Assemblies") using a five-foot spaced purlin theoretical model. ASHRAE also publishes Design Guides which include the recommended Methodology. (Am. Comp. ¶ 8.) ASHRAE represents to the consuming public in Wisconsin and elsewhere that if they purchase Assemblies and follow ASHRAE's Methodology in installing those Assemblies, those finished Assemblies will provide the intended thermal

performance claimed by ASHRAE, using current building practices. (Am. Compl. ¶ 9.) However, Thermal Design also asserts that the "ASHRAE Methodology as published, disseminated, circulated and placed before the public is inaccurate, incomplete, deceptive and misleading," in that utilizing the Methodology recommended by ASHRAE may not create the thermal performance that ASHRAE claims. (Am. Compl. ¶ 10.)

## II. DISCUSSION

A motion pursuant to Fed. R. Civ. P. 12(b)(6) requires the court to decide whether the plaintiff's pleadings actually state a claim upon which relief can be granted. For the purposes of a motion to dismiss, all factual allegations of the complaint are taken as true. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Eisen v. McCoy*, 146 F.3d 468, 470 (7th Cir. 1998). Such allegations must be viewed liberally and in the light most favorable to the plaintiff. *Harrel v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999). A complaint must contain enough "[f]actual allegations . . . to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). However, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 127 S. Ct. at 1969 n.8. However, the court is not required to "ignore any facts alleged in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1988).

3

Case 2:08-cv-00820-RTR   Filed 10/30/2008   Page 22 of 47   Document 14
Case 2:07-cv-00765-WEC   Filed 10/30/2008   Page 3 of 14   Document 71

## A. Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18

Both Thermal Design's original complaint and the amended complaint assert that ASHRAE violated Wisconsin's Deceptive Trade Practices Act ("DTPA"), as codified by Wis. Stat. § 100.18. I held in this court's April 25, 2008 decision and order that Thermal Design's original complaint failed to plead that ASHRAE published the allegedly inaccurate statements[2] with the intent required by § 100.18. (April 25, 2008 Order at 11.) However, I noted that "'intent' is not a magic word, and merely adding it to the complaint as it exists would not necessarily insulate the complaint from a motion to dismiss." (April 25, 2008 Order at 10.) In an attempt to comply with this court's order, Thermal Design's amended complaint asserts the following, in relation to its § 100.18 claim:

> ASHRAE promotes the purchase of Assembles to be installed using its Methodology *with the intent of inducing the Wisconsin public to enter into contracts to purchase competitive Assemblies*, which claim to meet the intended thermal performance claimed by ASHRAE, using current building practices, when they may not. The public would not otherwise have purchased those competitive Assemblies but for ASHRAE's misrepresentations.

(Am. Compl. ¶ 12 (emphasis added).)

ASHRAE asserts in its motion to dismiss the amended complaint that "Thermal Design treated 'intent' as a magic word" and failed to allege "additional facts suggesting how or why ASHRAE supposedly benefitted from promoting the sale of some insulation systems over others, despite having been given *two months* of discovery to uncover evidence of ASHRAE's 'extreme bias and conflicts of interest' involving its allegedly favored insulation system manufacturers.'" (Br. at 3 (emphasis in original) (citations omitted).)

---

[2] In the original complaint, Thermal Design alleged that ASHRAE inaccurately published faulty U-Values. (Compl. ¶ 23.) U-Values represent the overall thermal efficiency of a roof's structure and are one component included in determining the overall energy efficiency of a metal building. (Compl. ¶ 14.) In the amended complaint, Thermal Design does not mention the allegedly inaccurate U-Values; instead, Thermal Design broadly alleges that ASHRAE's recommended Methodology may not lead to the thermal efficiency claimed in the Standard and Appendix A. (Am. Compl. ¶ 10.)

In response, Thermal Design asserts that "in contrast to its initial complaint, Thermal Design has unequivocally asserted that ASHRAE's misrepresentations were made 'with the intent to induce an obligation,' i.e., 'to induce the Wisconsin public to enter into contracts to purchase competitive assemblies . . . [that] the public would not otherwise have purchased . . . but for ASHRAE's misrepresentations.'" (Resp. at 5.) Thermal Design asserts that this language is sufficient to remedy the deficiency of the original complaint, and that "nothing in § 100.18(1) requires that the defendant 'benefit' from the misrepresentation it makes," as ASHRAE alleges. (Resp. at 6.)

The Wisconsin Supreme Court has held that to state a claim under § 100.18, a plaintiff must allege that a defendant (1) "with the specified intent, made an 'advertisement, announcement, statement or representation . . . to the public,'" (2) "which contains an 'assertion, representation or statement of fact' that is 'untrue, deceptive or misleading,'" and (3) "that the plaintiff has sustained a pecuniary loss as a result of the 'assertion, representation or statement of fact.'" *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 39, 270 Wis. 2d 146, ¶ 39, 677 N.W.2d 233, ¶ 39 (citations omitted); *see also K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, ¶ 19, 732 N.W.2d 792, ¶ 19 ("To prevail on such a claim, the plaintiff must prove three elements. First, that with the intent to induce an obligation, the defendant made a representation to 'the public.' Second, that the representation was untrue, deceptive or misleading. Third, that the representation caused the plaintiff a pecuniary loss." (citing Wis. Stat. §§ 100.18(1) and (11)(b)(2))).

After thoroughly reviewing Thermal Design's amended complaint, I find that it has adequately pled a claim for relief under § 100.18. The amended complaint alleges that: (1) "with the intent of inducing the Wisconsin public to enter into contracts to purchase competitive Assemblies," ASHRAE published the Standard, (2) which contains "inaccurate, incomplete, deceptive and misleading" information, leading "the public to believe that if they purchase and install

5

the Assemblies using the ASHRAE Methodology, those Assemblies will meet the intended thermal performance claimed by ASHRAE," and (3) that as a result of ASHRAE's actions "Thermal Design has suffered a pecuniary loss in the form of lost sales to competitors and market share for its own Assemblies." (Am. Compl. ¶¶ 11, 12, 14). These allegations are enough to state a claim under the statute.

Certainly, the amended complaint would set forth a stronger claim had it contained the additional facts that ASHRAE claims should be required, to wit, "facts suggesting how or why ASHRAE supposedly benefitted from promoting the sale of some insulation systems over others." (*See* Br. at 3.) The inclusion of such facts would further support Thermal Design's allegations that ASHRAE published the misleading information with the requisite intent. Further, the court agrees with ASHRAE that the absence of such facts is particularly conspicuous given that the court previously granted the parties two months of discovery to uncover evidence of ASHRAE's "extreme bias and conflicts of interest." (*See* Pl.'s Oct. 31, 2007 Mot. at 3.) However, a plaintiff need not plead specific facts in the complaint; the complaint only needs to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 127 S. Ct. at 2200 (internal citation omitted). A district court is not at liberty to grant a motion to dismiss "based on [its] assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 127 S. Ct. 1969 n. 8. In short, the amended complaint asserts enough to let the plaintiff go forth with its claim, and the court must allow it to do so.[3]

---

[3] ASHRAE further attempts to persuade the court to dismiss Thermal Design's § 100.18 claim by attempting to draw parallels between the above-entitled action and *Int'l Brominated Solvents Ass'n v. Am. Conference of Govn't Indus. Hygienists, Inc.*, 5:04-CV-394, 2008 U.S. Dist. LEXIS 36901 (May 6, 2008 M.D. Ga.) ("*IBSA v. AMCGIH*"). However, *IBSA v. AMCGIH* was ultimately decided on motion for summary judgment, and the Georgia district court denied the defendants' motion to dismiss, holding that while "Plaintiffs have asserted a novel claim under . . . [Georgia's Uniform

## B. Lanham Act, 15 U.S.C. § 1125

Thermal Design's amended complaint, unlike its original complaint, asserts a claim of false advertising[4] under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The Lanham Act states, in pertinent part:

(a) Civil action.

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

ASHRAE asserts that Thermal Design has not set forth a viable claim under the Lanham Act for two reasons: (1) because "courts have required the party seeking compensation under this statute to compete with the defendant . . . [and] Thermal Design does not allege to compete against ASHRAE, " (Br. at 5-6), and (2) because "the Lanham Act concerns only false statements in 'commercial advertising or promotion . . . [and] Thermal Design alleges no facts tending to establish that ASHRAE's unspecified misrepresentations appeared in advertisements or promotions," (Br. at

---

Deceptive Trade Practices Act] the Court is unable to conclude from the facts alleged in the amended complaint that Plaintiffs have failed to state a claim." 393 F. Supp.2d 1362, 1383-84 (M.D. Ga. 2005). I hold similarly in this case.

[4] Subsection (a)(1)(A) of the Lanham Act is referred to as the false endorsement prohibition; subsection (a)(1)(B) is referred to as the false advertising prohibition. *L.S. Heath & Sons, Inc. v. AT&T Information Systems, Inc.*, 9 F.3d 561, 575 (7th Cir. 1993) (citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992)). Thermal Design does not articulate in its amended complaint whether its claim is based on subsection (a)(1)(A), subsection (a)(1)(B), or both. However, Thermal Design's brief in opposition refers only to false advertising, and therefore, the court presumes that Thermal Design pursues only a claim under that subsection of the Act, to wit, subsection (a)(1)(B).

6-7). In response, Thermal Design contends that: (1) it does not need to be in direct competition with ASHRAE to state a claim under the Lanham Act, (Resp. at 9), and (2) ASHRAE's conduct, as pled in the amended complaint, constitutes commercial advertising or promotion, (Resp. at 14). The court will address each issue in turn.

The Seventh Circuit Court of Appeals, adopting the standard set forth by the Ninth Circuit in *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), has held that in order to have standing to allege a false advertising claim under the Lanham Act, a plaintiff must "assert a discernible competitive injury."[5] *L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). However, this court's research has uncovered no cases in which the Seventh Circuit has articulated what might constitute such an injury. In that regard, *Waits* proves a useful guide.

In *Waits*, the plaintiff, Tom Waits ("Waits"), a successful singer and songwriter, filed a claim under § 43(a)[6] of the Lanham Act against the defendant Frito-Lay, Inc. ("Frito-Lay"), "premised on the theory that by using an imitation of his distinctive voice in an admitted parody of a Tom Waits [sic] song, the defendants misrepresented [Waits'] association with and endorsement of SalsaRio Doritos." 978 F.2d at 1097, 1106. The Ninth Circuit Court of Appeals, in an attempt to reconcile apparently conflicting district court decisions on the requirements of standing, found that § 43(a) of the Lanham Act provided for two separate types of liability: "(1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ('false association')", (15 U.S.C. 1125(a)(1)(A)), and "(2) false representations in advertising concerning the qualities of goods or services ('false

---

[5] The Ninth Circuit uses the phrase "discernibly competitive injury." *See Waits*, 978 F.2d at 1109.

[6] Section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a).

advertising')," (15 U.S.C. 1125(a)(1)(B)). *Id.* at 1108. The *Waits* court found the standing

requirements different for each type of claim. This court, however, need only concern itself with that

court's standing determinations in regards to false advertising claims under § 1125(a)(1)(B).

The *Waits* court held that in order to establish standing under the false advertising prong of

the Lanham Act, a plaintiff must allege "a discernibly competitive injury." *Id.* at 1109. The court

believed such a holding necessary to stay true to the Lanham Act's purpose, to wit, preventing unfair

competition. *Id.* The court used the following hypothetical to further define what constitutes a

"discernibly competitive injury":

> [Assume] for purposes of this hypothetical only that producers may rate their own
> films. If a film's distributer wrongfully indicates that a film is "PG"-rated when in
> reality it should be "R"-rated, a competitor with a PG-rated film would have standing:
> the misrated film theoretically draws young audiences away from the competitor's
> film because of the misrepresentation concerning the suitability of its content.

*Id.*

Thermal Design's amended complaint alleges, in essence, that similar to the way the

competitor's film in the *Waits* court's hypothetical lost a portion of its audience as a result of the

distributor's inaccurate description of a competing film, Thermal Design's assemblies have lost some

of their "audience" as a result of ASHRAE's inaccurate description of the thermal efficiency of

Assemblies competitive with Thermal Design's. In my view, based on the case law in this circuit

and its reliance on the case law in the Ninth Circuit, that is enough for purposes of combating a

motion to dismiss, to establish a "discernable competitive injury" and to provide Thermal Design

with standing to proceed with its claim.

Having established that Thermal Design has standing to bring its Lanham Act claim, the court

must next determine whether the claim has been properly pled. The Seventh Circuit Court of

Appeals has held that

[t]o establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). In its motion to dismiss the amended complaint, ASHRAE only argues that Thermal Design has failed to properly plead the first element, to wit, that ASHRAE made false or misleading statements in the context of "commercial advertising or promotion." (Br. at 6-7). Accordingly, the court will direct its analysis to that end.

The Seventh Circuit Court of Appeals has held that "[a]dvertising is a subset of persuasion and refers to dissemination of prefabricated promotional material." *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804 (7th Cir. 2001). "[It] is a form of promotion to anonymous recipients, as distinguished from face-to-face communication. In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not." *Id.* at 803-04.

ASHRAE asserts that "[a]lthough Thermal Design summarily alleges that 'ASHRAE promotes the purchase of' certain insulation manufacturers' products, Thermal Design alleges no facts tending to establish that ASHRAE's unspecified misrepresentations appeared in advertisements or promotions." (Br. at 6-7.) In response, Thermal Design contends that

ASHRAE disseminated its standards and associated exhibits, with the knowledge and expectations that it would be available to and considered important by virtually all vendors in the market for metal building insulation products. Moreover ASHRAE's self-stated importance in publishing industry standards is strong evidence that the information was sufficiently disseminated to relevant consumers. Therefore, the statements made by ASHRAE are clearly made in advertising or promotion and Thermal Design states a claim under the Lanham Act.

10

Case 2:08-cv-00828-RTR Filed 01/19/09 Page 29 of 47 Document 14-3
Case 2:07-cv-00765-WEC Filed 10/30/2008 Page 10 of 14 Document 71

(Resp. at 15-16.)

While the court is not convinced that the statements made by ASHRAE are *clearly* made in advertising and promotion, as Thermal Design contends, the court does find that the amended complaint, read in the light most favorable to the plaintiff, makes a tenable assertion that the Standard published by ASHRAE promotes certain Assemblies over others and does so in publications that are distributed to the general public. Assuming the facts alleged by the amended complaint to be true, as I must at this stage of the proceedings, I find the amended complaint to sufficiently plead that ASHRAE's alleged misrepresentations were made in the context of "commercial advertising or promotion."

### C. Common Law Unfair Competition

The amended complaint also reasserts a claim for unfair competition under Wisconsin common law. In this court's April 25, 2008 decision and order, I granted ASHRAE's motion to dismiss Thermal Design's unfair competition claim, relying on the *Restatement (Third) of Unfair Competition*.[7] I noted that subsection (a) of the *Restatement* articulates three separate "acts or

---

[7] *Restatement (Third) of Unfair Competition* § 1 (1995) states:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:

(1) deceptive marketing . . .;

(2) infringement of trademarks and other indicia of identification . . .;

(3) appropriation of intangible trade values including trade secrets and the right of publicity . . .;

or from other acts and practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

11

practices" actionable as unfair competition, to wit, deceptive marketing, trademark infringement, and misappropriation; and that subsection (b) provides for an unfair competition claim when an actor's actions are otherwise actionable under the law. (April 25, 2008 Order at 13.) I held that if Thermal Design intended to proceed under subsection (a) of the *Restatement* "its unfair competition claim [was] not pled with enough specificity to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and if Thermal Design intended to proceed under subsection (b) the claim failed because, at that time, I found Thermal Design's other claims to be inadequately pled. (April 25, 2008 Order at 14-15 (internal citations omitted).)

In its motion to dismiss the amended complaint, ASHRAE contends that

> Thermal Design's new complaint makes no attempt to allege deceptive marketing, trademark infringement or appropriation of trade values. Thermal Design therefore apparently asserts the second type of unfair-competition claim, where "the acts or practices are otherwise actionable under another statute or the common law. Neither other [sic] "statute or common law" claim, however, salvages Thermal Design's unfair-competition claim.
> . . . Thermal Design has no DTPA claim because it cannot allege ASHRAE's requisite intent–despite months of discovery on that very issue. Nor does Thermal Design state a claim under the Lanham Act because it does not compete with ASHRAE. Having failed to identify "acts or practices" by ASHRAE "actionable under another statute or the common law," Thermal Design cannot state a claim for unfair competition either.[8]

---

(b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

[8] Thermal Design's response focuses on whether the amended complaint needs to allege competition between the two parties. (Resp. at 16-18.) However, this was not the issue raised by ASHRAE in its motion to dismiss.

For future reference, however, the court notes that in its response brief, Thermal Design alleges that this court stated in its April 25, 2008 decision and order that "direct competition is not an essential element of a common law claim of unfair competition under the Restatement (Third) of Unfair Competition." (Resp. at 17.) This court made no such statement. In fact, I stated that "it is not entirely clear . . . that competition is always a necessary element of a common law unfair competition claim." (April 25, 2008 Order at 12.) Later in the order I noted that while Wisconsin requires unfair competition claims based on misappropriation to prove competition between the parties, Wisconsin courts do not require plaintiffs filing unfair competition claims based on trademark infringement to

(Br. at 7.)

I agree with ASHRAE that the amended complaint "makes no attempt to allege deceptive marketing, trademark infringement or appropriation of trade values" or to otherwise claim that "the acts or practices are otherwise actionable under another statute or the common law." The court's April 25, 2008 decision and order was clear that an amended complaint should contain such language. I will nevertheless allow the plaintiff to go forward with its common law unfair competition claim.

While Thermal Design does not explicitly set forth in the amended complaint exactly what acts or practices the plaintiff alleges under subsection (a) of the *Restatement* or whether it intends to set forth a claim under subsection (b), the court will permit the claim to go forward because Thermal Design has successfully pled unfair competition claims under both federal and state law–allowing the claim to proceed under subsection (b). Further, the court finds that the amended complaint gives the defendant fair notice of an unfair competition claim based on deceptive marketing under subsection (a). Given the allegations in the complaint, no other act or practice articulated by the *Restatement*, i.e., trademark infringement or appropriation of trade values, makes logical sense. Accordingly, the court will allow the plaintiff to proceed with its common law unfair competition claim.

The court is concerned, however, with the validity of a common law unfair competition claim for deceptive marketing under Wisconsin law. Indeed, during the course of this litigation, the parties have cited numerous cases alleging claims of unfair competition under the common law; however,

---

make such a showing. (*Id.* at 14 (citing *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) and *Mercury Record Prods., Inc. v. Economic Consultants, Inc.*, 64 Wis. 2d 163, 174, 218 N.W.2d 705, 709 (1974)).) Whether an unfair competition claim for deceptive marketing requires competition between the parties is yet to be determined by this court.

neither party has directed the court to any case in which a Wisconsin court considered a case of common law unfair competition based on deceptive marketing. Rather, the Wisconsin cases cited by the parties mention only unfair competition claims based on misappropriation or trademark infringement, neither of which is relevant to the action currently pending. *See Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W.2d 129 (Wis. 1979) (common law trademark infringement); *Mercury Record Prods., Inc. v. Economic Consultants, Inc.*, 64 Wis. 2d 163, 218 N.W.2d 705, (Wis. 1974) (misappropriation).

Because the parties have not cited to any cases in which a Wisconsin court has addressed unfair competition based on deceptive marketing, the court has not and cannot articulate the elements of such a claim and address whether they have been properly set forth in the amended complaint. I am allowing the plaintiff to proceed with the claim because I do not feel at this particular time I have enough information with which to decide its fate with finality.

**NOW THEREFORE IT IS ORDERED** that ASHRAE's Motion to Dismiss the First Amended Complaint (dkt # 65) be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that a scheduling conference be conducted Tuesday, November 18, 2008, at 9:30 a.m., in Room 253 of the United States Court House, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, to discuss the further processing of this case. Parties more than fifty miles from the courthouse may be permitted leave to appear by telephone.

**SO ORDERED** this <u>30th</u> day of October, 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

Westlaw.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
(Cite as: 2008 WL 1902010 (E.D.Wis.))

Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.
THERMAL DESIGN, INC., Plaintiff,
v.
AMERICAN SOCIETY OF HEATING, REFRI-
GERATING AND AIR-CONDITIONING ENGIN-
EERS, INC., Defendant.
No. 07-C-765.

April 25, 2008.

John G. Goller, Von Briesen & Roper SC, Milwau-
kee, WI, for Plaintiff.
F. Joy Riddick-Seals, M. Russell Wofford, Jr., King
& Spalding LLP, Atlanta, GA, Cristina D Hernan-
dez-Malaby, Quarles & Brady LLP, Milwaukee,
WI, for Defendant.

### DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WILLIAM E. CALLAHAN, JR., United States Ma-
gistrate Judge.

### I. PROCEDURAL BACKGROUND

**\*1** On August 24, 2007, the plaintiff, Thermal
Design, Inc. ("Thermal Design"), filed a complaint
in the United States District Court for the Eastern
District of Wisconsin alleging that the defendant,
American Society of Heating Refrigerating and Air-
Conditioning Engineers, Inc. ("ASHRAE"), acted
in violation of Wisconsin's Deceptive Trade Prac-
tices Act (Wis.Stat. § 100.18) and engaged in com-
mon law unfair competition.[FN1] On September 17,
2007, ASHRAE filed a motion to dismiss the com-
plaint. That motion is now fully briefed and is
ready for resolution.

> FN1. The court has jurisdiction over this
> matter pursuant to 28 U.S.C. § 1332 be-
> cause the parties are citizens of different

states and the matter in controversy ex-
ceeds $75,000.

On October 10, 2007, Thermal Design moved the
court for the issuance of a temporary restraining or-
der and preliminary injunction, seeking to enjoin
ASHRAE from "the current and future publication
of [the] identified false informa-
tion."(Prelim.Inj.Mot.1.) On October 18, 2007, fol-
lowing a motion hearing, the court denied Thermal
Design's motion for a temporary restraining order
and set a briefing schedule for the preliminary in-
junction motion. On November 20, 2007, following
a motion filed by Thermal Design, the court
amended the briefing schedule for the preliminary
injunction motion, providing the parties with time
to conduct discovery, limited in scope to the issues
raised by the preliminary injunction motion. The
plaintiff's motion for preliminary injunction is now
fully briefed and is ready for resolution.

### II. FACTUAL BACKGROUND

Some background information is needed to set the
stage for ruling on the parties' respective motions.
The background information is gleaned from the
parties' submissions.

ASHRAE is a corporation whose self-proclaimed
mission is "to advance the arts and sciences of heat-
ing, ventilating, air conditioning and refrigerating
to serve humanity and promote a sustainable
world."(Def's Resp. to Prelim. Inj. Mot., Ex. M at
1.) In pursuit of this mission, ASHRAE publishes
and distributes over 100 technical manuals covering
a broad range of areas, including energy efficiency,
indoor air quality, thermal comfort, fans, heat
pumps, icemakers, refrigeration, and solar energy.
(Ramspeck Aff. ¶ 3.) These publications provide
technical information about how to achieve its
standards-in this case, for energy efficiency. (Def's
Resp. to Prelim. Inj. Mot. 2.)

Thermal Design is a business engaged in the devel-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



EXHIBIT
F

opment and provision of insulation systems for large non-residential metal buildings. (Compl.¶ 4.) Thermal Design's primary product line consists of ceiling and wall insulation systems. *(Id.)*

Under the United States Energy Conservation and Production Act, all non-residential metal buildings in the United States that are heated or cooled are required to meet a minimum energy conservation standard. (Prelim.Inj.Mot.2.) The Department of Energy ("DOE") established ASHRAE's Standard 90. 1, *Energy Standard for Buildings Except Low-Rise Residential Buildings,* as the minimum standard for all state building energy codes. *(Id.)* One component of the energy efficiency of a metal building is the overall thermal efficiency of the roof structure, also known as the U-Value or the U-Factor. *(Id.)* The U-Value gives a numeric rating of the amount of heat that passes through a building's roof; therefore, the lower the U-Value the more energy efficient the insulation method. (Compl.¶ 13.) For example, a metal building, such as a temperature conditioned athletic field house or indoor tennis court, is required to have a roof insulation system that, when installed, provides for a maximum overall roof heat loss U-Value of less than .065. (Prelim.Inj.Mot.2.) If the insulated roof system of a metal building does not meet the minimum requirement set forth in ASHRAE's Standard 90. 1, it does not pass the state and federal building/energy code. *(Id.)* Similar codes apply for wall thermal performance of conditioned metal buildings. *(Id.* at 3.) Appendix A of Standard 90.1 lists numerous insulation methods and their corresponding U-Values to aid in code compliance. (Compl.¶ 20.)

*2 Thermal Design alleges that beginning in 1999 ASHRAE "dramatically relaxed U-Value requirements for metal buildings and also included Appendix A Tables containing U-Values for metal building insulation for five-foot spaced purlin theoretical models."(Compl.¶ 13.) Thermal Design alleges that the new U-Values were not independently developed and tested by ASHRAE. (Compl.¶¶ 15, 20.) Instead, Thermal Design alleges that the U-

Values were provided to ASHRAE by the North American Insulation Manufacturers Association ("NAIMA").*(Id.)* NAIMA then uses the U-Values listed in ASHRAE Standard 90.1 in its brochures with the purpose of promoting the use of NAIMA's 202 certified fiberglass insulation. *(Id.* ¶ 16.)Specifically, Thermal Design alleges that the U-Values NAIMA provided to ASHRAE:

> are inaccurate, incomplete and insufficient for accurately determining the overall U-Value of the roof assembly and true compliance with the minimum requirement of the Standard and related code.... The advertised U-Values give the presumption of Energy Code compliance to NAIMA insulation assemblies that upon information and belief do not meet the minimum U-Value required by the Energy Code.

*(Id.* ¶¶ 23, 25.)Further, Thermal Design contends that:

> Despite knowledge of the false, deceptive and misleading character of the advertised U-Values, and without a good faith belief in the accuracy of the information, ASHRAE continues to publish its 90.1-2004 Standard, and upon information and belief will publish an updated version of the 90.1 Standard in October of 2007, containing the same false, deceptive and misleading information.

(Compl.¶ 30.) Thermal Design argues that the inaccurate U-Values listed for NAIMA's metal building assemblies, allegedly the only assembly systems listed in Appendix A, "give unfair advantages to Thermal Design's competitors who sell and promote the systems represented in Appendix A." (Compl.¶¶ 26, 27.)

### III. DISCUSSION

As previously stated, two motions are currently pending before the court: ASHRAE's motion to dismiss and Thermal Design's motion for preliminary injunction. The court will address each motion in turn.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
(Cite as: 2008 WL 1902010 (E.D.Wis.))

## A. Motion to Dismiss

A motion pursuant to Fed.R.Civ.P. 12(b)(6) requires the court to decide whether the plaintiff's pleadings actually state a claim upon which relief can be granted. For the purposes of a motion to dismiss, all factual allegations of the complaint are taken as true. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993); *see also Eisen v. McCoy,* 146 F.3d 468, 470 (7th Cir.1998). Such allegations must be viewed liberally and in the light most favorable to the plaintiff. *Harrel v. Cook,* 169 F.3d 428, 431 (7th Cir.1999). A complaint must contain enough "[f]actual allegations ... to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). However, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly,* 127 S.Ct. at 1969. However, the court is not required to "ignore any facts alleged in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988).

**\*3** ASHRAE asserts that the court should dismiss Thermal Design's claims because (1) "Thermal Design has filed its claims two to five years late under the respective statutes of limitations and repose"; (2) "Thermal Design has failed to allege that ASHRAE-who does not compete in any way with Thermal Design-has said anything qualifying as a public advertisement or sales announcement under Wisconsin's Deceptive Trade Practices Act"; and

(3) "the statements that Thermal Design *does* identify in its Complaint-those concerning compilations of test data reached by industry consensus-are nowhere properly alleged to be false."(Def's Br. 1.) For the reasons which follow, ASHRAE's motion to dismiss will be granted.

### 1. *Statute of Limitations*

ASHRAE moves the court to dismiss Thermal Design's complaint based on a finding that each of Thermal Design's claims-violations of Wis. Stat. § 100.18 and common law unfair competition-are statutorily time barred. ASHRAE's motion to dismiss, insofar as it is predicated on the assertion that the plaintiff's claims are statutorily time barred, will be denied.

The Wisconsin Deceptive Trade Practices Act ("DTPA") disallows claims filed "more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action."Wis. Stat. § 100.18(11)(b)(3). ASHRAE contends that "Thermal Design alleges a single 'unlawful act or practice': ASHRAE's 'pass-through reproduction' of NAIMA-provided test data" and that "[t]hose data-the efficiency values associated with metal-building insulation-have not changed since ASHRAE's first 'reproduction' of them in 1999."(Def's Br. 4-5; citing Compl. ¶¶ 8, 17 and Exs. C and D.) FN2 Accordingly, ASHRAE moves the court to find that because "Thermal Design thus sues under § 100.18 based on alleged misrepresentations first made eight years ago-more than five years since the statute of repose on that claim expired ... the Court must dismiss Thermal Design's [DTPA] claim."(Def's Mot. 5; citing *Staudt v. Artifex Ltd.,* 16 F.Supp.2d 1023, 1031 (E.D.Wis.1998) (granting motion to dismiss on statute of limitations).)

> FN2. Exhibit C purports to provide the disputed U-Value tables for insulation systems installed in metal building walls as published by ASHRAE in 1999 and 2004.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit D purports to provide the disputed U-Value tables for insulation systems installed in metal building roofs as published by ASHRAE in 1999 and 2004. Both exhibits establish that the published data has remained unchanged since 1999.

Although Fed.R.Civ.P. 12 ordinarily limits the court's review to the complaint and its attachments, the court may also consider documents incorporated into the complaint by reference. *Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint, and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.")

Because Thermal Design references the U-Value tables for 1999 and 2004 throughout its complaint, the tables are central to Thermal Design's claims, and ASHRAE attached the tables to its motion to dismiss, the court may properly consider these documents in ruling upon ASHRAE's motion to dismiss.

In response, Thermal Design claims that its DTPA claim is "based on false statements of fact that are currently being published and that will continue to be published in ASHRAE 90.1-2004 and the soon to be published update ASHRAE 90.1-2007."[FN3](Pl's Resp. 2-3.) More specifically, Thermal Design states that "[t]he unlawful practice alleged in this lawsuit continues to occur, and therefore, the statute of repose has not been triggered."(*Id.* at 3.) It alleges that the complaint adequately summarizes as much at paragraph 30, stating that:

FN3. Plaintiff's complaint and response to the motion to dismiss were filed prior to ASHRAE's scheduled update of Standard 90.1. The court assumes that ASHRAE did indeed republish Standard 90.1 in October of 2007, prior to the issuance of this decision and order.

30. Despite knowledge of the false, deceptive and misleading character of the advertised U-Values, and without a good faith belief in the accuracy of the information, ASHRAE continues to publish its 90.1-2004 Standard, and upon information and belief, will publish an updated version of the 90.1 Standard in October of 2007, containing the same false, deceptive and misleading information.
**\*4** (*Id.;* citing Compl. ¶ 30.)

The parties advance similar arguments with respect to Thermal Design's common law unfair competition claim.

I will construe the DTPA claim in this case as being similar to a defamation or libel claim, in which the challenged communication is reproduced in multiple editions of the same publication. In such situations, the Wisconsin Supreme Court has "held that every sale and delivery of a written or printed copy of a libel is a fresh publication" thereby creating a new cause of action. *Voit v. Wisconsin State Journal,* 116 Wis.2d 217, 223, 341 N.W.2d 693, 697 (1984) (citing *Street v. Johnson,* 80 Wis. 455, 458 (1891)). Applying the rule set forth by the Wisconsin Supreme Court, I deem each edition of Standard 90.1, in 1999, 2004, and 2007, as creating a new cause of action. Accordingly, because Standard 90.1 was printed in 1999, 2004, and 2007, I am persuaded that the statute of repose does not time-bar the plaintiff's claims.

### 2. *Wisconsin's Deceptive Trade Practices Act (Wis.Stat. § 100.18)*

In the alternative, however, ASHRAE argues that Thermal Design's DTPA claim "proposes an unprecedented extension of § 100.18" in that it attempts to "stretch[ ] a statute concerned with 'advertisements' or 'sales announcements' to cover

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
(Cite as: 2008 WL 1902010 (E.D.Wis.))

purely technical data published by a company unengaged in the trade that it studies."(Def's Br. 7.)

The DTPA provides, in pertinent part:

No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any ... merchandise ... or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any ... merchandise ... shall make ... an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such ... merchandise ... which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1).

ASHRAE argues that § 100.18"covers commercially motivated representations: invitations to buy goods or services 'offered by [the speaker]' *or* any 'inducement[ ] to enter into any contract or obligation." (Def's Br. 7; citing § 100.18(1) and *Uniek v. Dollar Gen. Corp.,* 474 F.Supp.2d 1034, 1037 (W.D.Wis.2007).) ASHRAE further argues that "courts have interpreted § 100.18 to provide a cause of action to: (1) consumers defrauded by the seller/defendant in a business transaction, or (2) competitors injured by their competitor/defendants' fraudulent business practices." (Def's Br. 7; citations omitted.) Arguing that "Thermal Design has sued a publisher of 'technical and educational information' designed to 'improve energy efficiency in commercial buildings' " and that "Thermal Design does not allege to have been misled by this information," ASHRAE seeks to have Thermal Design's DTPA claim dismissed. (Def's Br. 8.)

**\*5** In response, Thermal Design contends that "ASHRAE's selective quotation of the Wisconsin Supreme Court demonstrates a fundamental misrepresentation" of the case law relating to § 100.18. (Pl's Resp. 4.) Instead, Thermal Design argues that the relevant case law does not interpret § 100.18"to limit the actionable published information to 'advertisement or sales announcements' but includes statements or representations containing any assertion, representation or statement of fact which is untrue, deceptive or misleading."*(Id.)*

To state a claim under Wis. Stat. § 100. 18, the Wisconsin Supreme Court has held that a plaintiff must allege that the defendant (1) "with the specified intent, made an 'advertisement, announcement, statement or representation ... to the public,' " (2) "which contains an 'assertion, representation or statement of fact' that is 'untrue, deceptive or misleading,' " and (3) "that the plaintiff has sustained a pecuniary loss as a result of the 'assertion, representation or statement of fact.' " *Tietsworth v.. Harley-Davidson, Inc.,* 270 Wis.2d 146, 170, 677 N.W.2d 233, 245 (2004); *see also K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.,* 2007 WI 70, ¶ 19, 301 Wis.2d 109, ¶ 19, 732 N.W.2d 792, ¶ 19 ("To prevail on such a claim, the plaintiff must prove three elements. First, that with the intent to induce an obligation, the defendant made a representation to 'the public.' Second, that the representation was untrue, deceptive or misleading. Third, that the representation caused the plaintiff a pecuniary loss.") (citing Wis. Stat. §§ 100.18(1) and 100.18(11)(b)(2)).

In its complaint, Thermal Design does not allege that ASHRAE published the allegedly false U-Values either "with intent to sell, distribute, increase the consumption of or in any wise dispose of any ... merchandise.. or anything offered by such person, firm, corporation" or "with intent to induce an obligation."Wis. Stat. § 100.18(1). Instead, the complaint alleges that the "advertised U-Values were provided to ASHRAE by ... NAIMA," (Compl.¶ 15), and that "NAIMA uses the U-Values

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
(Cite as: 2008 WL 1902010 (E.D.Wis.))

advertised in ASHRAE 90.1-2004 in its brochures with the purpose of promoting the use of NAIMA 202 certified fiberglass insulation," (Compl.¶ 16). To state the obvious, however, NAIMA is not named as a defendant in this case.

Thermal Design may be correct in contending that the DTPA does not "limit the actionable published information to 'advertisement or sales announcements' but includes statements or representations containing any assertion, representation or statement of fact which is untrue, deceptive or misleading."*(See* Pl's Resp. 4.) But, such contention does not go far enough. Indeed, the statute does seem to allow certain "untrue, deceptive or misleading" "assertions, representations, and statements" to fall within its purview. However, in order for those assertions, representations, and statements to fall within the purview of the statute they must be accompanied by the requisite intent. *K & S Tool & Die Corp.*, 2007 WI 70, ¶ 19, 301 Wis.2d at ¶ 19, 732 N.W.2d at ¶ 19. In other words, such assertions, representations, and statements must be made either "with intent to sell, distribute, increase the consumption of or in any wise dispose of any ... merchandise.. or anything offered by such person, firm, corporation" or "with intent to induce an obligation."Wis. Stat. § 100.18(1).

**\*6** Nowhere in its complaint does Thermal Design allege that ASHRAE's intent in publishing the allegedly faulty U-Values was either for the purpose of selling its publication or for the purpose of inducing any sort of obligation. To be sure, Thermal Design *does* allege in its complaint that "ASHRAE's pass-through reproduction of NAIMA's advertised U-Values ... promotes the sales of ASHRAE's publication."(Compl.¶ 17.) However, Thermal Design's allegation that ASHRAE may have gleaned some benefit from the publication of the allegedly faulty U-Values, i.e., increased circulation of its publication, does not rise to the level of an allegation that ASHRAE's *intent* in publishing the allegedly defective U-Values was to sell, distribute, or dispose of its publication

or induce any sort of obligation. In my opinion, Thermal Design's allegation, that "ASHRAE's pass-through reproduction of NAIMA's advertised U-Values ... promotes the sales of ASHRAE's publication," does not, on its own, constitute an allegation that ASHRAE acted "with the specified intent" required in order to assert a claim under the statute. *See Tietsworth,* 270 Wis.2d at 170, 677 N.W.2d at 245.

To be clear, however, the court notes that "intent" is not a magic word, and merely adding it to the complaint as it exists would not necessarily insulate the complaint from a motion to dismiss. Indeed, the Seventh Circuit Court of Appeals stated in *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614 (7th Cir.2007):

> The Court explained in *[Bell Atlantic v. Twombly,* 127 S.Ct. 1955 (2007) ] that the "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."Instead, the Court held, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level."Although this does "not require heightened fact pleading of specifics," it does require the complaint to contain "enough facts to state a claim to relief that is plausible on its face."...[The Seventh Circuit Court of Appeals] understands the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."

*Killingsworth,* 507 F.3d at 618-19 (internal citations omitted).

In conclusion, because I find the plaintiff to have not plead that ASHRAE published the allegedly faulty U-Values with "the specified intent" required under the DTPA, ASHRAE's motion to dismiss the plaintiff's DTPA claim will be granted.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3. *Common Law Unfair Competition*

Addressing Thermal Design's common law unfair competition claim, ASHRAE argues that while multiple forms of this common law action exist "[a]ll forms ... feature one 'essential element': competition between the parties."(Def's Br. 11; citing *Mercury Record Prods., Inc. v. Economic Consultants, Inc.,* 64 Wis.2d 163, 173-74, 218 N.W.2d 705, 709 (1974); *see also Mercury Record Prods., Inc. v. Economic Consultants, Inc.,* No. 80-1106, 1981 WL 138912, *3 (Wis. Ct.App. Oct. 27, 1981 (citing 1974 *Mercury Record).* Because the complaint alleges that Thermal Design "develop[s] and provid[es] insulation systems for non-residential buildings," (Compl.¶ 4), while ASHRAE "publishes and distributes ... trade related publications," (Compl.¶ 6), ASHRAE argues that "Thermal Design's allegations foreclose any possibility that it could establish this 'essential element' " and moves the court to dismiss the common law unfair competition claim. (Def's Br. 11).

*7 In response, Thermal Design alleges that "[c]ompetition has been alleged" because the complaint states that "Thermal Design competes with the members of ASHRAE thus demonstrating a connection between the statements and the harm."(Pl's Resp. 9; citing Compl. ¶¶ 17-27.) More specifically, Thermal Design points to paragraphs 17-27 of the complaint in which Thermal Design alleges that "NAIMA is an 'Organizational Member' with organizational seats on some of ASHRAE's committees" and that "NAIMA has at least one seat on the ASHRAE SSPC 90.1 Committee which develops the ASHRAE 90.1 Standard."

In my opinion, Thermal Design's allegation that NAIMA is a member of ASHRAE fails to transform ASHRAE into a competitor of Thermal Design's. While it may be true that NAIMA produces insulation systems that compete with those of Thermal Design's, ASHRAE, by Thermal Design's own admission, "publishes and distributes ... trade related publications."In no way does the complaint allege that ASHRAE's trade publication competes with Thermal Design's insulation systems.

That having been said, it is not entirely clear to this court that competition is always a necessary element of a common law unfair competition claim. While it is true that *Mercury Record Productions,* the unpublished Wisconsin case cited by ASHRAE, states that "[c]ompetition is an essential element of the claim of unfair competition," that case addressed only unfair competition based upon misappropriation, a claim not asserted by the plaintiffs. *See* 1981 *Mercury Record,* 1981 WL 138912, * 3.

The court's own research has revealed very few Wisconsin state court cases discussing the claim of common law unfair competition. Indeed, that few such cases exist is further evidenced by (1) the fact that the only case cited by the defendant in support of its assertion that competition is a required element of an unfair competition claim is a single unpublished decision from 1981 and (2) the fact that the plaintiff cites no case law.

Thus, I will turn to *Restatement (Third) of Unfair Competition* (1985) for some guidance relative to identifying the elements of an unfair competition claim.

*Restatement (Third) of Unfair Competition states that:*

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability [for unfair competition] to the other for such harm unless:

(a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatements relating to:

(1) deceptive marketing ...;

(2) infringement of trademark and other indicia of identification ...;

(3) appropriation of intangible trade values

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
**(Cite as: 2008 WL 1902010 (E.D.Wis.))**

including trade secrets and the right of publicity ...;

or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

**\*8** (b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

*Restatement (Third) of Unfair Competition* § 1 (1995). In other words, the Restatement articulates several different types of common law unfair competition claims. A claim arises under (a) when the claim is based on the acts or practices articulated in (a), i.e., deceptive marketing, trademark infringement, or misappropriation. A claim arises under (b) when the acts or practices are otherwise actionable under another statute or the common law.

That the *Restatement* breaks down unfair competition claims in this manner is informative in that it may explain why Wisconsin courts define the elements of an unfair competition claim differently depending on the type of claim articulated in the complaint. For example, under Wisconsin case law "[t]o establish a case of unfair competition based on trademark infringement, a plaintiff must prove two elements: (1) validity of the mark in question; and (2) infringement." *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). However, to establish a case of unfair competition based on misappropriation Wisconsin courts have stated that a plaintiff must prove three elements: "(1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff." 1974 *Mercury Record Productions,* 64 Wis.2d at 174, 218 N.W.2d at 709.

Thermal Design does not articulate in its complaint

on which theory its common law unfair competition claim is predicated. If Thermal Design intends for its unfair competition claim to proceed under paragraph (a) of the *Restatement,* the complaint would need to articulate which prohibited act or practice ASHRAE engaged in because each act or practice (i.e., deceptive marketing, trademark infringement, and misappropriation) requires proof of different elements under Wisconsin case law. *Compare Echo Travel, Inc,* 870 F.2d at 1266 (finding that under Wisconsin case law "[t]o establish a case of unfair competition based on trademark infringement, a plaintiff must prove two elements: (1) validity of the mark in question; and (2) infringement) *with 1974 Mercury Record,* 64 Wis.2d at 174, 218 N.W.2d at 709 (finding that under Wisconsin case law to establish a case of unfair competition based on misappropriation, a plaintiff must prove three elements: "(1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff").

If Thermal Design intends to proceed under paragraph (a), its unfair competition claim is not plead with enough specificity to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."*See Erickson,* 127 S.Ct. at 2200. Simply stated, the complaint does not articulate the acts or practices in which ASHRAE engaged that form the basis of the unfair competition claim.

**\*9** Similarly, if Thermal Design intends for its unfair competition claim to proceed under paragraph (b), the claim necessarily must be dismissed because, as explained above, Thermal Design has not alleged that "the acts or practices of [ASHRAE] are actionable ... under federal or state statutes, international agreements, or general principles of common law apart from those considered in [the] Restatement"*See Restatement (Third) of Unfair Competition* § 1(b).

In sum, because Thermal Design has failed to allege a claim of common law unfair competition with the requisite specificity, ASHRAE's motion to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1902010 (E.D.Wis.)
(Cite as: 2008 WL 1902010 (E.D.Wis.))

dismiss the common law unfair competition claim will be granted.

### 4. Equity Jurisdiction

Finally, Thermal Design argues that, even if the court were to find that it failed to adequately plead the necessary elements of its claims, it should nevertheless grant the plaintiff equitable relief. More particularly, Thermal Design argues that

> the Court can equitably enjoin the prohibited false statements of fact. A court of equity may, in fashioning a remedy for the fraudulent conduct of one party, join another party not directly involved in the fraud but one necessary to provide complete relief.

(Pl's Resp. 10; citing *Wisconsin v. Excel Mgmt. Servs., Inc.,* 111 Wis.2d 479, 331 N.W.2d 312 (1983).)

In response, ASHRAE argues that, in the only case cited by Thermal Design in support of its equity argument, the court found a claim to exist under Wis. Stat. § 100.18. Because this court has not found such a claim to have been pleaded and because "Thermal Design has cited no authority providing that a Court may grant a form of relief where the plaintiff has alleged no claim ... the Court should dismiss Thermal Design's Complaint and decline to grant any relief sought."(Def's Reply 11.)

I agree with ASHRAE that equitable relief is inappropriate in this case. In *Excel Management Services,* the case cited by Thermal Design in support of its argument for equitable relief, the Wisconsin Supreme Court allowed the plaintiffs to obtain equitable relief from First Savings Bank, which was alleged to have "had actual knowledge of several of the [§ 100.18] violations by defendant Viking." 111 Wis.2d at 484, 331 N.W.2d at 314. The complaint alleged that Viking, the defendant actually engaged in the prohibited conduct, was without significant financial resources to cover any damages recovered in the suit. *Id.* at 485, 331 N.W.2d at 315. Accord-

ingly, the court allowed the plaintiff to join First Savings Bank as a defendant in the action in order to make the plaintiff whole. *Id.* at 488,311 N.W.2d at 316. However, unlike the plaintiff in *Excel Management Services,* the plaintiff in this case has named no defendant against which a proper violation of § 100.18 has been alleged. Without the plaintiff having named some defendant against which relief under the DPTA would be proper, the court cannot begin to determine whether equitable relief against ASHRAE would be appropriate.

### B. Motion for a Preliminary Injunction

**\*10** As stated previously, on October 10, 2007, the plaintiff filed a motion for preliminary injunction. In order to obtain a preliminary injunction, the movant "must demonstrate a likelihood that it will prevail on the merits of the lawsuit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief." *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005)."If these requirements are met, the court must then balance the degree of irreparable harm to the plaintiff against the harm that the defendant will suffer if the injunction is granted."*Id.* Moreover, the movant must show that the preliminary injunction will not harm the public interest. *Goodman v. Ill. Dep't of Fin. & Prof 'l Regulation,* 430 F.3d 432, 437 (7th Cir.2005).

"A party with no chance of success on the merits cannot attain a preliminary injunction." *AM Gen. Corp. v. Daimlerchrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002) (citing *Kiel v. City of Kenosha,* 236 F.3d 814, 815 (7th Cir.2000))."In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success-in other words, a greater than negligible chance of winning."*Id.* (citing *Washington v. Indiana High Sch. Ath. Ass'n,* 181 F.3d 840, 845 (7th Cir.1999)). Once the court determines that there is some likelihood of success, "the analysis turns to a 'sliding-scale' under which a lesser likelihood of success can be made sufficient by a greater predominance of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

balance of harms."*Id.* (citing *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001)).

In order to obtain a preliminary injunction, Thermal Design must first demonstrate a likelihood that it will prevail either on its DTPA claim or its unfair competition claim. Because the court is granting the defendant's motion to dismiss for failure to state a claim, it necessarily follows that the plaintiff's motion for preliminary injunction must be denied.

## IV. CONCLUSION AND ORDER

In conclusion, the defendant's motion to dismiss for failure to state a claim will be granted. However, pursuant to Thermal Design's request in its response to the defendant's motion to dismiss, (Def's Resp. 9), Thermal Design will be granted leave to amend its complaint, should it choose to do so. The plaintiff's motion for preliminary injunction will be denied.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion to dismiss be and hereby is **GRANTED** (dkt.# 5);

**IT IS FURTHER ORDERED** that no later than ten days following the entry of this order, the plaintiff may, if it chooses to do so, file an amended complaint addressing the deficiencies identified in this decision and order; if no amended complaint is filed, this action will be dismissed;

**IT IS FURTHER ORDERED** that the plaintiff's motion for preliminary injunction be and hereby is **DENIED** (dkt.# 14).

**SO ORDERED.**

E.D.Wis.,2008.
Thermal Design, Inc. v. American Society of Heating Refrigerating and Air-Conditioning Engineers, Inc.
Slip Copy, 2008 WL 1902010 (E.D.Wis.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1843370 (N.D.Ill.), 2006-2 Trade Cases P 75,352
**(Cite as: 2006 WL 1843370 (N.D.Ill.))**

Page 1

**H**

United States District Court, N.D. Illinois, Eastern
Division.
MERIX PHARMACEUTICAL CORPORATION,
v.
GLAXOSMITHKLINE CONSUMER HEALTH-
CARE, L.P., and Smithkline Beecham Coporation.
**No. 5 C 1403.**

June 28, 2006.

Ronald Y. Rothstein, Jeffrey A. Leon, Kimball
Richard Anderson, Stephen P. Durchslag, Vishal
Raj Sahni, Winston & Strawn, Chicago, IL, for
Merix Pharmaceutical Corporation.
Christina M. Tchen, Justin Lee Heather, Skadden
Arps Slate Meagher & Flom, LLP, Chicago, IL, for
Glaxosmithkline Consumer Healthcare, L.P., and
Smithkline Beecham Coporation.

MEMORANDUM, OPINION AND ORDER

ANDERSEN, J.
**\*1** In February 2005, GlaxoSmithKline Consumer
Healthcare, L.P. ("GSK") filed suit in New Jersey
federal court against Merix Pharmaceutical Corp.
("Merix") challenging the advertising of ViraMedx
RELEEV, an over-the-counter ("OTC") cold sore
drug manufactured and marketed by Merix. Ap-
proximately one month later, Merix filed suit in this
Court against GSK, challenging the advertising for
Abreva, an OTC cold sore drug marketed by GSK,
and Valtrex, a prescription medication used to treat
cold sores, genital herpes, and shingles, both of
which compete with RELEEV. Merix claims GSK's
advertising of Abreva and Valtrex violates (i) the
Illinois Consumer Fraud and Deceptive Business
Practice Act, 815 ILCS 505/1, *et seq.* (the "ICFA");
(ii) the Illinois Uniform Deceptive Trade Practices
Act, 815 ILCS 510/1, *et seq.* (the "IDTPA"); (iii)
the federal Lanham Act; and (iv) Illinois common
law. With respect to Valtrex, Merix contends that
GSK's statements that the drug is a "One-Day Cold-

Sore Treatment" for cold sores and "3-Day Out-
break Therapy" for genital herpes on the internet, in
print, press releases and television advertising are
false and misleading and therefore in violation of
the ICFA, IDTPA, Lanham Act and Illinois com-
mon law. The advertising is alleged to have oc-
curred within the Northern District of Illinois.

The Food and Drug Administration ("FDA") ap-
proved Valtrex in 1995 pursuant to a New Drug
Application. The FDA directed that "patients
should be instructed that treatment for cold sores
should not exceed 1 day (2 doses)." With respect to
genital herpes, the FDA approved a recommended
dosage of "500 mg twice daily for 3 days" for the
treatment of recurrent episodes and "1 gram twice
daily for 10 days" for the treatment of initial epis-
odes.

Merix characterizes GSK's statements that Valtrex
is a "One-Day Cold-Sore Treatment" for cold sores
and "3-Day Outbreak Therapy" for genital herpes
as a "campaign of deception regarding the efficacy
of its drugs and unscientific conclusions based on
unreliable test date."GSK contends its advertising
does no more than repeat what the FDA requires it
to inform patients who take, and doctors who pre-
scribe, Valtrex. Merix points to studies evidencing
that GSK's "One-Day Cold Sore Treatment" and
"3-Day Outbreak Therapy" are false and misleading
statements and thus violate the ICFA, IDTPA, Lan-
ham Act and Illinois common law. It claims the
statements "influence purchasing decisions and
mislead unwitting doctors into recommending and
prescribing" the drug. Merix claims these practices
divert sales away from Merix to GSK and, as a res-
ult, it is entitled to an injunction, damages, an ac-
counting of GSK's profits on Valtrex sales, and at-
torneys' fees.

*Standard of Review*

A motion for judgment on the pleadings pursuant to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



EXHIBIT
C

tabbies®

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1843370 (N.D.Ill.), 2006-2 Trade Cases P 75,352
**(Cite as: 2006 WL 1843370 (N.D.Ill.))**

Rule 12(c) is reviewed under the same standard that applies to dismissals under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See R.J. Corman Derailment Servs., L.L.C. v. Int'l Union, Local Union 150,* 335 F.3d 643, 647 (7 th Cir.2003). A motion for judgment on the pleadings should be granted "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomas v. Guardsmark, Inc.,* 371 F.3d 701, 704 (7th Cir.2004). This Court must accept all well-pleaded allegations as true, drawing all reasonable inferences from those facts in the Plaintiff's favor. *Id.*

### Rule 9(b)

**\*2** Each of Plaintiff's claims, though framed under distinct legal theories, all emanate from the same factual allegations-that the Defendant committed consumer fraud by disseminating false and misleading advertising. Claims alleging consumer fraud under the ICFA and Lanham Act must be plead with particularity under Fed.R.Civ.P. 9(b).*See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp. 1241, 1243-44 (N.D.Ill.1994) To meet this heightened standard, a plaintiff alleging fraudulent misconduct must state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992). When the alleged fraud occurred over a period of time, the Rule's pleading requirements-including the "time" requirement-apply less stringently. *Mutuelle Generale Francaise Vie v. Life Insurance Co. of Pennsylvania,* 688 F.Supp. 386, 393 (N.D.Ill.1988). The plaintiff does not have to allege evidentiary details, rather, it is only required to "set forth the basic outline of the scheme, who made what representations and the general time and place of such misrepresentations."*Mutuelle Generale Francaise Vie,* 688 F.Supp. At 393. In fact, the "identity" requirement is met when a plaintiff pleads only the entity making the statement, the place requirement

is satisfied by a general statement setting forth that the statements were made in all fifty states, the content requirement only mandates that the plaintiff mention the type and nature of the misleading statements, and the "method" requirement is reached by pleading the type of advertising in which the statements appeared. *Hot Wax, Inc. V. Grace-Lee Products, Inc.,* No. 97 C 6882 (N.D.Ill. Sept.15, 1998), 1998 WL 664945.

Based on these considerations, this Court finds that Merix has met the Rule 9(b) particularity requirements. First, Merix identifies the entity making the alleged misrepresentations-Defendant GSK-thereby satisfying the "identity" requirement. Second, Merix satisfies the "time" requirement by asserting that GSK is making the alleged misrepresentations on an ongoing basis. Third, Merix asserts GSK committed the alleged fraudulent activity in the Northern District of Illinois and therefore satisfies the "place" requirement. Fourth, the complaint fulfills the "content" requirement by identifying the "One-Day Cold-Sore Treatment" and "3-Day Outbreak Therapy" statements about Valtrex as the false and misleading advertising claims. Fifth, the complaint alleges that GSK marketed its products through "the internet, in print, press releases, point-of-purchase and television advertising," thereby satisfying the method requirement. For the reasons above, this Court denies GSK's motion with respect to Rule 9(b) pleading requirements.

### ICFA Claims

The ICFA prohibits unfair methods of competition, including the use of false or misleading information in the conduct of commerce with intent that others rely upon the information. *815 Ill. Comp. Stat. 505/2.*To establish a violation of the ICFA's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving trade or commerce. *Zekman v. Direct Am.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Marketers, Inc.,* 182 Ill.2d 359, 695 N.E.2d 853, 860, 231 Ill.Dec. 80 (Ill.1998); *Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 607 N.E.2d 194, 198, 180 Ill.Dec. 300 (Ill.1992). If the alleged deceptive practice implicates consumer protection concerns, a defendant's competitor may bring an ICFA claim. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F.Supp. 1241 (N.D.Ill.1994).* Under the ICFA, a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive. *People ex rel. Hartigan v. Knecht Servs., Inc. .,* 216 Ill.App.3d 843, 575 N.E.2d 1378, 1387, 159 Ill.Dec. 318 (Ill.App.Ct.1991); see also *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 938 (7th Cir.2001). When determining whether a statement has the capacity to deceive, courts should examine the statement in the context of other information available to consumers. *See Bober,* 246 F.3d at 940.

**\*3** GSK seeks dismissal under an ICFA section explicitly setting forth that no conduct specifically authorized by any regulatory body of Illinois or the United States of America can create liability under the statute. 815 ILCS 505/10b(1). The Seventh Circuit has explained that this section ensures that the ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations." *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 941 (7th Cir.2001). At the same time, the "exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate."*Id.*

Many of Merix's allegations concerning Valtrex are lifted from the Prescribing and Patient Information. Merix argues that the dosage recommendations, clinical study data and notifications made in the information sheets prove that GSK is disseminating broad, baseless statements to "unwitting consumers and health care professionals."The Prescribing and Patient Information, however, are also the genesis for the statements GSK made in its advertising campaign for Valtrex.

Judge Zagel noted in a nearly identical context concerning a class action pending against GSK, "there is not enough information in the complaint to state definitively that GSK's statements are labeling that is specifically authorized by the FDA ... It may [ ] be possible for GSX to show that the marketing was almost identical to the specifically authorized labeling, but at this point, there is no evidence to decide one way or the other"*Annette Scott v. Glaxosmithkline Consumer Healthcare, L.P.,* No. 05 C 3005 (N.D. Ill. April 12, 2006). We agree that, at this point, there is insufficient information for us to determine whether the Valtrex advertising campaign falls under the purview of the ICFA exemption for statements authorized by the FDA. Accordingly, GSK's motion is denied as to the ICFA claims.

### Lanham Act & Common Law Claims

GSK asks us to dismiss the Lanham Act claims because "there is no private right of action under the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 321, *et seq.,* [ ("FDA Act") ] and therefore a private party has no standing to challenge whether a competitor has properly obtained FDA approval, or to look behind the FDA's approval and question whether the FDA acted properly."However, Merix's Complaint does not seek to assert a private right of action under the FDA Act. Instead, Merix argues that GSK's statements are literally false, and hence actionable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Courts routinely allow this type of claim to go forward, regardless of whether or the allegedly false statements are within the purview of the FDA. *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc.,* 720 F.Supp. 714, 716 (N.D.Ill.1989) ("The fact that [plaintiff] refers to or relies on an FDA regulation defining orange juice to support its Lanham Act claim is not grounds for dismissal.)

**\*4** GSK also asks us to dismiss the IDTPA claim

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1843370 (N.D.Ill.), 2006-2 Trade Cases P 75,352
**(Cite as: 2006 WL 1843370 (N.D.Ill.))**

Page 4

because that statute is "merely a codification of the Illinois common law of unfair competition."However, we have allowed the ICFA claim to proceed. Merix pleaded a claim that falls within the IDTPA and the Illinois common law of unfair competition.

### Conclusion

For the above stated reasons, Merix's motion to dismiss the Valtrex claims [38] is denied.

It is so ordered.

N.D.Ill.,2006.
Merix Pharmaceutical Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.
Not Reported in F.Supp.2d, 2006 WL 1843370 (N.D.Ill.), 2006-2 Trade Cases P 75,352

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.