# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THERMAL DESIGN, INC.,

          Plaintiff,

                                         **Case No. 08-C-828**

      -vs-

GUARDIAN BUILDING PRODUCTS, INC.,
GUARDIAN BUILDING PRODUCTS
DISTRIBUTION, INC., and GUARDIAN
FIBERGLASS, INC.,

          Defendants.

---

## DECISION AND ORDER

---

Thermal Design competes in the sale of ceiling and wall insulation systems for large non-residential metal buildings. So do the remaining defendants in this case – Guardian Building Products, Guardian Building Products Distribution, and Guardian Fiberglass. For simplicity, the Court will generally refer to this group of entities as "Guardian" or the "Guardian Defendants." Thermal Design and Guardian accuse each other of false advertising in violation of the Lanham Act. There are other claims and counterclaims, most of which are implicated by the parties' cross-motions for summary judgment. These motions are discussed herein.

### Background

Thermal Design sells a product called the "Simple Saver System," an insulation system that can be installed in roofs and walls of non-residential buildings. With respect to a roof, through the use of a steel trap grid support system, a custom sized polymer liner fabric

and fasteners, it isolates the highly conductive steel roof purlins in a metal building from the conditioned space, creating a strong platform to allow unfaced insulation to be installed under, between and/or over the purlins with minimal insulation compression. The Simple Saver System mimics a suspended ceiling, which serves aesthetic and interior lighting distribution functions.

In 2000, Thermal Design added alternative fall protection to the Simple Saver System as a standard feature for worker protection. Dan Harkins, Thermal Design's Vice President of Research and Development, consulted with OSHA on test and safety requirements. In response, Harkins received the following letter:

> Dear Mr. Harkins:
>
> This is in response to your September 11 letter requesting a letter of compliance from the Occupational Safety and Health Administration (OSHA) for your Simple Saver Plus System.
>
> As you know, OSHA does not endorse products nor issue formal letters of approval for products or work procedures. However, when provided with sufficient information, OSHA can offer an opinion as to whether or not they afford compliance with certain regulations. We have reviewed the Simple Saver Plus fall protection information and test data and it appears that if the flexible fabric is installed as described in your specifications for materials and installation documents, the user would be in compliance with OSHA's fall protection requirements for falls to the interior of the structure. As we have discussed previously, employees exposed to falls to the exterior may (depending on the activity and fall height) have to be protected by a guard rail or other effective system.
>
> If we can be of any further assistance, please contact me or Mr. Dale Cavanaugh of my staff at (202) 219-8136.
>
> Sincerely,
>
> Roy F. Gurnham, P.E., J.D.
> Director

-2-

Office of Construction and Maritime
Compliance Assistance

From approximately 1992 until 2007, Thermal Design bought nearly its entire supply of fiberglass insulation from Guardian for use in Thermal Design's ceiling and wall insulation systems. In 2001, Thermal Design's largest competitor at the time, CGI (n/k/a CGI/Silvercote), began selling a fabric liner system which it named the Energy Saver System. In March of 2006, Guardian purchased CGI and began selling a product dubbed the Energy Saver FP ("ESFP") System. The Energy Saver is a fabric liner system. Like the Simple Saver System, the Energy Saver components include the use of a fabric liner, steel support straps and fasteners under the bottom of the purlins. It consists of metal banding, a fabric liner placed onto the banding, and insulation placed over the top of the fabric.

For a period of time after the acquisition of CGI, Guardian sold both the Simple Saver System and the Energy Saver. Guardian's distribution relationship with Thermal Design ended soon after Guardian decided to add fall protection to the Energy Saver System. In September of 2007, Dan Harkins wrote that "Guardian is now offering fall protection with the Energy Saver System. That is quite a slap in the face. . . . I have instructed no more orders to Guardian until we reach some mutually acceptable business relationship. Failing that I will give them a few things to spend their time and money on, other than targeting our company."

On October 22, 2007, Guardian issued a press release announcing that its "Energy Saver insulation system has been enhanced to include OSHA-compliant leading edge fall

-3-

protection." The press release is entitled "ENERGY SAVER FP™ SYSTEM OFFERS

LEADING EDGE FALL PROTECTION." It states in part as follows:

> SOLON, Ohio – (October 22, 2007) – Larry Zupon, Vice President of Guardian Building Products Distribution, Inc.'s Silvercote business unit, announced today that its Energy Saver insulation system has been enhanced to include OSHA-compliant leading edge fall protection. This insulation system protects the installation crew while the building is insulated and roofed.
>
> "The Energy Saver FP System offers metal building contractors a reliable, safe and efficient OSHA-compliant fall protection system to insulate the roofs of pre-engineered metal buildings. The system also includes GreenGuard certified Guardian fiberglass insulation as well as all other components needed," stated Zupon.
>
> Consisting of a network of white galvanized banding and white support fabric, the system restrains and supports up to 400 pounds dropped from at least 42" above the system, therefore meeting OSHA guidelines as defined in Title 29 C.F.R. 1926.502.
> ...
> To insure quality and worker safety, GBP Silvercote provides training on how to properly install the system. An online contractor certification program will be available by the end of the year. Leading edge fall protection is certified by GBP Silvercote when installed by Guardian certified installation contractors.

ECF Nos. 204-1, 204-2, C. Harkins Aff., Exs. A and B.

Guardian also distributed an advertisement entitled "ENERGY SAVER FP™ – YOUR

SAFEST BET." This document states in part as follows:

> ➢ **OSHA COMPLIANCE** – The Energy Saver FP™ System meets the requirements for leading edge fall protection as presented in Title 29 C.F.R. 1926.502. To meet OSHA guidelines an insulation support and fall protection system must

-4-

restrain and support 400 pounds dropped from at least 42" above the system. The Energy Saver FP™ System passes this rigorous test!

The second page of this advertisement shows a bag labeled "400 pounds," with a statement "WE DROP EVERYTHING FOR SAFETY!" ECF Nos. 217-6, 217-7, Conta Aff., Exs. F and G.

Another advertisement was entitled "ENERGY SAVER FP SYSTEM FEATURES AND BENEFITS." This advertisement states, in part, as follows:

**WHY CHOOSE ENERGY SAVER FP™?**

➢ **FALL PROTECTION**

Protects the installation crew while the building is insulated and roofed by providing OSHA-compliant leading edge fall protection.

The ad further states: "the Energy Saver FP™ System is designed for only single use leading edge fall protection. It is not intended to be stepped into or walked upon. In the event of a fall, Energy Saver FP™ cannot be relied upon to provide leading edge fall protection until the fabric and banding are replaced with new components." ECF Nos. 217-8, 217-9, Conta Aff., Exs. H and I.

Guardian also offers the Purlin Glide system, an insulation system using wide rolls of vapor retarder fabric on cores up to 27 feet long spanning perpendicular over-the-top of multi-purlin spaces. Through the use of mechanical dispensing devices, the Purlin Glide fabric is incrementally unrolled parallel to the purlins, down the length of the building with one or more layers of unfaced insulation installed on top of the fabric sheeting, with the

-5-

metal exterior roof panels installed on top of that insulation, then compressed and structurally fastened through the purlins. Like the Simple Saver System and the Energy Saver, the Purlin Glide is a type of insulation system that can be used in metal buildings.

One way to determine how insulation performs with respect to thermal performance in a representative building assembly is to test the installed thermal conductance, which yields the assembly U-value. The mathematical inverse of the conductance, 1/U-value, then yields the resistance value to the measured conductance and is referred to as the installed assembly R-value. The higher the assembly R-value the better it is by resisting the heat transfer, so the easier it is to maintain the difference in temperature across it per unit of time. The higher the installed R-value the better or more efficient a building is to heat and cool.

With respect to the Purlin Glide system, Guardian circulated an advertisement entitled "Purlin Glide FP$^{TM}$ Insulation & Leading Edge Fall Prevention System." This advertisement included the following table:

| Tested Thermal Values Per ASTM C 1363 *(Hot Box Test) Installed R-Values* | | |
|---|---|---|
| **Thickness** | **R-Value** | **U-Value** |
| R-30* 9 ½" | R-22.44 | .045 |
| R-19 6" | R-17.00 | .059 |
| R-10 3" | R-11.11 | .090 |

*Double Layer R-11

ECF Nos. 217-12, 217-13, Conta Aff., Exs. L and M.

Starting in September of 2009, Guardian circulated a document entitled "PURLIN GLIDE FP Features and Benefits." This advertisement included the following box, with R-values and U-values that differ from its previous ads:

**Tested Thermal Values Per ASTM C 1363**

(Hot Box Test) Installed R-values*

| Thickness | R-Value | U-Value |
|---|---|---|
| R-30** 9 ½" | R-20.5 | .049 |
| R-19    6" | R-15.4 | .065 |
| R-10    3" | R-10.0 | .100 |

\* System R-values per ASTM C 1363 using a ½" polystyrene (R-3) thermal block and standing seam roof. Above results reflect a mean temperature of 75 degrees Fahrenheit. These tests were conducted using a Guarded Hot Box apparatus at Oak Ridge Laboratory in Oak Ridge, TN.
\*\*Double Layer R-11 and R-19

ECF No. 217-14, Conta Aff., Exhibit N.

## Analysis

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748,

752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

## I.      Thermal Design's Claims

Thermal Design brought ten claims in its Third Amended Complaint. ECF No. 56. All of these claims were dismissed to the extent they apply to any party besides the Guardian Defendants. ECF No. 221. Additionally, Counts II, IV, VI and VIII were dismissed by stipulation. ECF No. 175. Guardian moves for summary judgment on all of Thermal Design's remaining claims. Thermal Design moves for summary judgment on Counts I and VII.

### A.      Counts I, III, V, VII: False Advertising (Lanham Act)

To prevail on a false advertising claim under Section 43(a) of the Lanham Act, a party must plead and prove: (1) a false or misleading statement of fact was made in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material in that it is likely to influence a purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result, either by direct diversion of sales from itself to defendant or by a loss of goodwill

-8-

that is associated with its products. *Hot Wax, Inc. v. Turtle Wax*, 191 F.3d 813, 819 (7th Cir. 1999); 15 U.S.C. § 1125(a)(1)(B). False statements under the Lanham Act fall into two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but convey a false impression or mislead in context. *Id.* at 820. When a statement is literally false, a plaintiff is not required to prove that the statement actually deceived consumers or was likely to do so. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999). But when the statement is literally true or ambiguous, the plaintiff must prove that the statement is "misleading in context, as demonstrated by actual consumer confusion." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994).

In *BASF*, the Seventh Circuit held that a "Lanham Act plaintiff bears the burden of proving literal falsity, but . . . the proof sufficient to meet this burden will vary depending upon the statement made. If the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that those tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false." *BASF* at 1091. Such advertisements are referred to as "establishment claims," as opposed to "non-establishment claims," where the challenged advertisement makes independent claims (e.g., Vicks cough syrup starts to work the instant you swallow) or comparison claims (our product works faster than theirs). *Id.* at 1090. For establishment claims, statements in the form of "'tests show x' are literally false if tests do not establish 'x.'" *Id.* at 1091.

Some courts hold that an advertisement with an establishment claim can be shown to be literally false if the referenced tests "were not sufficiently reliable to permit a conclusion that the product is superior." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992) (citing *Proctor & Gamble Co. v. Chesebrough-Pond's, Inc.*, 747 F.2d 114, 119 (2d Cir. 1984)); *see also Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514-15 (8th Cir. 1996); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993). The "not sufficiently reliable" test was acknowledged, but not applied, by the Seventh Circuit in *BASF*. In a more recent case, Judge Crabb expressed reservations about this test because it "leads to a strained reading of the phrase 'literally false': a court's determination that a test is 'unreliable' leads to a conclusion that a statement in the form of 'test shows x' is literally false even if the test *really does* show x." *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 972 (W.D. Wis. 2010) (emphasis in original). Despite the apparent uncertainty over whether the test would be applied in the Seventh Circuit, the Court will assume that it applies for purposes of the pending motions.

### 1. Fall protection

Guardian advertises that its Energy Saver FP System provides OSHA-compliant leading edge fall protection pursuant to 29 CFR § 1926.502. The corresponding "drop-test" consists of a "400 pound (180 kg) bag of sand 30 + or - 2 inches (7/6 + or - 5 cm) in diameter dropped into the net from the highest walking/working surface at which employees are exposed to fall hazards, but not from less than 42 inches (1.1 m) above that level." 29 C.F.R. § 1926.502(c)(4)(i). Thermal Design retained Dr. Svenn Borgersen to conduct a "series of

-10-

fall protection tests" and to "evaluate the fall protection capabilities of Guardian's Energy Saver System FP." ECF No. 225-17, Report at 3. After performing some drop tests and evaluating some prior drop tests, Dr. Borgersen concluded that the Energy Saver, "in either its previous configurations or current form, has not and does not meet the requirements for leading edge fall protection, per OSHA 29 CFR 1926.502(c)(4)(i)." *Id.* at 18. Moreover, in his rebuttal report, Dr. Borgersen opined that the "conclusions and opinions of [Dr. Nigel Ellis] regarding the OSHA 1926.502(c) fall protection performance of the Guardian Energy Saver FPTM Roof System are invalid, based not only on the methods used to install the system on the test fixture, but also in the manner that the multiple drop tests were conducted without repairing or replacing the system components after each test." ECF No. 225-21, Report at 6. This evidence is sufficient to create a genuine issue as to whether Guardian's advertisements are literally false.

Conversely, Thermal Design moves for summary judgment on its claim that Guardian failed to disclose that the Energy Saver does not pass the drop test within six feet of the perimeter/edges of the building. To quote Thermal Design's turn of phrase, "if this piece of paper were a roof, the space between the outer edges of the paper and the typed portion (the margin) has no OSHA compliant fall protection provided by the ESFP. Any person working in 'the margin' will fall, hard and fast, to the ground or floor level below." However, "the meaning of the alleged literal falsehood must be considered *in context and with reference to the audience to which the statement is addressed*." *Schering-Plough Healthcare Products v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009) (emphasis added). While it may

-11-

be literally false to claim that the Energy Saver passes the drop test within six feet of the edge of the structure, Guardian produced evidence suggesting that the six foot margin is excluded when using the phrase "leading edge fall protection." For example, Fred Parish, a Thermal Design salesman, testified as follows:

> [Q]    Sir, if I use the phrase "leading edge fall protection," as applied to an insulation system, what does that phrase mean to you, "leading edge fall protection?"
>
> A     With my knowledge of the building, that means that if you're on a building and you have so many sheets of roof system on, then the leading edge is what's in 6 feet, is the way I understood it. *Within 6 feet of the edge is not fall protection*, but the – as you're roofing your leading edge, you are protected.
>
> ...
>
> Q     All right. Is it your impression that your customers, who you've known for many years, have the same impression of what leading edge fall protection means as you just explained to me?
>
> A     *I believe so*
>
> Q     Okay. Do you ever explain to customers what leading edge fall protection is?
>
> A     *Most of them already know*.
>
> Q     Do they? How come?
>
> A     *Because they're bound by OSHA to make sure they do it.*
>
> Q     Okay. so when you're selling the product, do you find people already know what leading edge fall protection means, that phrase?
>
> A     *Most of them yes*.

Consistent with this understanding, Guardian's contractor agreement advises of the need for "perimeter fall protection while working within 6' of the building edge," and Guardian's

-12-

installation instructions warn that "perimeter fall protection" is still required. ECF No. 231, Guardian's Statement of Additional Material Facts, ¶¶ 19, 26, 27. Accordingly, there is a genuine issue of fact as to whether Guardian's advertisements are literally false with respect to the area within 6 feet of the perimeter of the building. "The purpose of the false-advertising provisions of the Lanham Act is to protect sellers from having their customers lured away from them by deceptive ads. . . . [I]f no one is or could be fooled, no one is or could be hurt." *Schering-Plough* at 512.

### 2. "Considered an equal"

Thermal Design argues that Guardian salespeople violated the Lanham Act by stating, in direct email communication with potential customers, that the Energy Saver System is "considered an equal" to the Super Saver System. *See, e.g.,* ECF No. 214-5, Guardian's Statement of Proposed Material Facts, ¶ 116 ("Here is one of the brochures on our Energy Saver Fall Protection Insulation System. Our product . . . is considered an equal to the Simple Saver System. We are hoping you will agree to accept our product as an alternate/equal to the Simple Saver"); ¶ 117 ("This has our Energy Saver Fall Protection system quoted. This is considered an equal to the Simple Saver system"). "Person-to-person" communications are not considered "commercial advertising or promotion" for purposes of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). "Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication. In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not." *First Health*

*Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803-04 (7th Cir. 2001); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003) (Lanham Act does not cover "all deceitful business practices"). Therefore, Guardian's motion will be granted to the extent it applies to these individualized communications. *Metro. Life Ins. Co. v. O'M & Assoc. LLC*, No. 06 C 5812, 2009 WL 3015210, at *6 (N.D. Ill. Sept. 16, 2009) ("the allegedly deceitful announcements . . . sent out to customers via mail were direct communications that do not come within the scope of § 1125(a)(1)(B)").

### 3. Light reflectivity; continuous length banding; extrusion welding

In response to Guardian's motion for summary judgment, Thermal Design argues that it is not alleging that Guardian's advertisements are false solely because of their claims regarding light reflectivity, continuous length banding, or extrusion welding. Rather, they are claiming that the Energy Saver is not equal to the Simple Saver in these respects, so it is false advertising to claim as such. But Guardian does not claim that the Energy Saver is "considered an equal" to the Simple Saver in any actual advertisements. As discussed in the previous section, these comments were made in individualized communications to potential customers, not "commercial advertising or promotion" as required by the Lanham Act.

### 4. Thermal performance - Purlin Glide

Thermal Design alleges that Guardian falsely advertised the thermal performance of its Purlin Glide system because the installed R-values contained in those advertisements are based on an invalid test. Dr. Leslie Christianson opines that the underlying test, conducted by Tom Petrie at the Oak Ridge National Laboratory in 2001, was "not representative of

-14-

typically installed insulation systems." ECF No. 225-32, Report at 6. Another expert, Dr. Thomas Diller, analyzed a series of tests and observed that "[o]bviously the insulation systems were different, even though they were supposedly the same system." ECF No. 225-31, Report at 7. Moreover, Dr. Diller opines that the "report by Petrie (2001) that has the low U values does not provide sufficient details about the system that was tested to allow validation." *Id.* at 8. This evidence creates an issue of fact as to whether the 2001 "Hot Box" test does or does not prove the proposition in Guardian's advertisements.

On the other hand, Thermal Design believes it is entitled to summary judgment based upon the fact that Guardian changed its reported R-values in 2009. The R-values in Guardian's pre-September 2009 advertisements were based upon a mean temperature of 35.1° F, but its new brochure reported the R-values based upon a mean temperature of 75° F. The pre-September 2009 advertisements do not reference a mean temperature, so the R-values contained therein may be literally false, but only if the audience to which the statement is addressed would assume 75° F or anything other than 35.1° F as a mean temperature. In his rebuttal report, Dr. David Yarbrough wrote that the "75° F mean temperature that Professor Christianson claims should have been used is associated with labeling of insulation materials. The FTC rules for *residential* insulation require that performance at mean temperature 75° F be used in labeling. However, the FTC rule does not apply to non-residential application such as metal buildings. . . . Thus, Professor Christianson's erroneous 75° F 'accepted practice' statement . . . likely comes from the rules for residential insulation (which are again inapplicable here)." ECF No. 234-41, Report at 7. Dr. Yarbrough further notes that he is

-15-

"not aware of any standard that is recognized as being the authority for determining what the 'accepted practice' is with respect to the temperature for measuring thermal transmittance of metal building insulation." *Id.* Accordingly, there is a genuine issue of material fact as to whether Guardian's pre-September 2009 advertisements are literally false with respect to the reported R-values.

### 5. Thermal Performance – "Over-the-Purlin" products

Thermal Design alleges that a brochure distributed by the North American Insulation Manufacturers Association (NAIMA), entitled "ASHRAE 90.1 Compliance for Metal Buildings," identifies incorrect thermal performance values for various insulation systems. ECF No. 56-9, Third Amended Complaint, Exhibit 12. The guide "contains typical metal building insulation system constructions and their associated U-values when different thicknesses of insulation are used. These insulation system constructions are listed by geographical region." According to the brochure, NAIMA is the "association for North American manufacturers of fiber glass, rock wool, and slag wool insulation products. Its role is to promote energy efficiency and environmental preservation through the use of fiber glass, rock wool, and slag wool insulation, and to promote the safe production and use of these materials." Even though Guardian's name is listed on the last page of the brochure as a "NAIMA Metal Building Committee Member," Guardian had nothing to do with the publication of the brochure. According to Angus Crane, NAIMA's Executive Vice President and General Counsel, Guardian was "not a participating member of the Committee and had no role in preparing or generating the NAIMA article or any information contained therein.

-16-

Although the NAIMA article says, the 'NAIMA Metal Building Committee developed this guide,' Guardian in fact had no role in its development." ECF No. 214-5, Guardian Facts, ¶ 197. Therefore, this claim must be dismissed because Guardian did not cause the NAIMA publication to enter interstate commerce. *Hot Wax* at 819.

### 6. U-Values – Calculated vs. Tested (In Place) Methods

Thermal Design alleges that a linked-to article on Guardian's website includes incorrect U-Values and an incorrect formula for calculating thermal insulation values for OP (over-the-purlin) insulation systems. The language on Guardian's website reads as follows:

> U-values – Calculated vs. Tested (In Place) Methods
>
> A variety of terms and symbols are used to measure thermal performance. Other than the R Value, the most frequently used heat transfer term is U Value. Click on the red button to the right to open a .PDF document that will explain the difference between a Calculated and a[] Tested (or "in place") U Value.
>
> Specifications (PDF)

ECF Nos. 225-34, 225-35, Conta Aff., Exs. GG, HH. The referenced article, like the language quoted above, says nothing about any particular Guardian or Thermal Design product. Therefore, even if the article includes false or misleading information, it cannot form the basis of a false advertising claim. *Hot Wax* at 819 (plaintiff must prove a false statement of fact in a commercial advertisement about its own or another's product).

### 7. Damages

A plaintiff seeking damages under Section 35(a) of the Lanham Act must prove that the violation "caused actual confusion among consumers of the plaintiff's product, and, as

-17-

a result, that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)." *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990). Actual deception is presumed if an advertisement is literally false, *Interactive Products Corp. v. a2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 699 (6th Cir. 2003), but a plaintiff seeking monetary damages "must show more than a mere presumption of actual consumer confusion based on a finding of literal falsity." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 481 (D.N.J. 2009). "While a finding of literal falsity does support a presumption of actual confusion among consumers, this presumption does not somehow demonstrate that [the plaintiff] was damaged by such confusion in this case." *Societe Civil Succession Richard Guiono v. Beseder Inc.*, No. CV 03-1310-PHX-MHM, 2007 WL 3238703, at *6 (D. Ariz. Oct. 31, 2007).

Thermal Design failed to produce any evidence that it was "damaged by actual consumer reliance on the misleading statements." *L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). On the other hand, Guardian produced evidence which demonstrates that consumers were not confused by Guardian's ads. *See, e.g.,* ECF No. 214-5, Guardian Facts, ¶ 229 (King Construction) ("At no time did [Guardian Salesperson] Mr. Wescott make any representations regarding the Energy Saver System, and at no time did I understand him to be promoting a Simple Saver System, or any other product of Thermal Design, Inc."); ¶ 231 (Glidden Fire Station project) ("At all times I understood that Mr. Wescott was promoting/selling an Energy Saver FP for the Glidden Project"); ¶ 234 (McCreary County Multipurpose Center) ("At all times I was aware of the fact that these

-18-

were different products made by different manufactur[ers]. I was aware of the differences in their attributes, and found those differences to be immaterial given the objectives and purpose of the insulation system for this project"). Accordingly, Guardian is entitled to summary judgment on Thermal Design's claim for damages. "Other avenues of relief, however, are not foreclosed. In the past, courts have fashioned wide-ranging relief for a violation of the Lanham Act, allowing remedies such as a recovery of defendant's profits, an award of costs of the action, and, in some exceptional cases, an award of attorney's fees. These remedies flow not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence, for example, or, in the case of costs, merely from proof of the defendant's Lanham Act violation." *Web Printing* at 1205 (internal citations omitted).

### B.   Count IX: Tortious Interference

Wisconsin law recognizes a cause of action for tortious interference with existing and prospective contractual relations. *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994). Thermal Design's claims are based upon 128 alleged incidents where the Simple Saver System was specified by a design professional as "appropriate" to use in the project, but Guardian's Energy Saver System was used instead. According Casey Harkins, Thermal Design's Vice President of Technology, when the Simple Saver System is "specified for use in a project, it is the product that shall be used, or if substitutions are allowed, proposed substitutions must meet or exceed all the requirements of the Simple Saver System in addition to any explicit performance requirements specified. If a potential bidder

-19-

wants to propose a product that does not meet the minimum specification requirements, it must be done through appropriate procedures and revised specifications must be issued as an Addendum in advance of the bid deadline to ensure all bidders are bidding to the same minimum specification requirements." ECF No. 224, C. Harkins Aff., ¶ 4.

Contrary to the vague assertions of Casey Harkins, the architect for the McCreary County Multipurpose Center explained that while the "original specifications for this project used the Simple Saver System as the 'basis for design,'" the Simple Saver System was not considered a requirement. "The Contractor was free to, and did in fact, submit a bid using any product that met the basic requirements of the building." ECF No. 211-41, J. Taylor Dec., ¶ 10. Other architects said more or less the same thing: that the relevant project documents allowed and even invited substitutions so long as the product ultimately met the "minimum specifications" of the building. *See, e.g.,* ECF No. 211-49, Huff Dec., ¶ 8 (Eagle Transit Bus Barn) ("The substitution of products on an 'equal to' basis does not literally mean equal in every respect. Instead, substitutions are approved or disapproved based on whether the product accomplishes the same functional purpose in substantially the same manner as the originally listed product(s). The job of the architect or engineer is not to dictate supply chain; it is to dictate the performance of the building"); ECF No. 211-44, Ahl Dec., ¶ 6 (Glidden Fire Station) ("When writing specifications, my firm and I expect, welcome, and accept submissions of alternative products on an 'equal to' basis. These submissions serve to raise our awareness of products in the industry, create valuable competition in the marketplace, and help keep costs down for the building owners").

-20-

Accordingly, and notwithstanding the self-serving affidavit of Casey Harkins, Thermal Design failed to create an issue of fact as to the existence of "sufficiently certain, concrete and definite prospective relationship[s]." *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 689 (7th Cir. 1999). "It goes without saying that a legally binding contract is one in which the parties manifested their intention to be bound to an agreement, the terms of which are sufficiently certain and definite. Plaintiffs' failure to come forward with any evidence as to the intent of the members of the distribution network to enter into contracts with Plaintiffs is necessarily fatal to their claim that they had prospective contractual relationships with those members. . . . [S]elf-serving affidavits . . . are not sufficient to create a genuine issue of material fact at the summary judgment stage." *Id.* at 684 (internal citations omitted).

### C. <u>Count X</u>: Misappropriation

Thermal Design concedes to the dismissal of this claim to the extent it applies to the Guardian Defendants.

## II. Guardian's Counterclaims

The Guardian Defendants brought seven counterclaims against Thermal Design. Counterclaims IV (ECF No. 175) and VI (ECF No. 195) were dismissed by stipulation. Thermal Design moves for summary judgment on Counterclaims I, II and III. Guardian moves for summary judgment on Counterclaims II and VII. Neither party filed a motion with respect to Counterclaim V.

### A. <u>Counterclaim II</u>: Defamation

-21-

The Court has diversity jurisdiction over this counterclaim which is governed by Wisconsin law. The elements of a defamation claim in Wisconsin are: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, it tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her. *Hart v. Bennet*, 672 N.W. 2d 306, 317 (Wis. Ct. App. 2003). Guardian claims that a variety of statements made in a variety of mediums were defamatory, including: Guardian is "putting innocent workers at risk of serious injury and death;" Guardian adopted a "market whoring scheme;" Guardian "counterfeited our system;" and Guardian's "motive is to confuse purchasers and prey off the good will, reputation and value of the highly promoted and specified simple saver system, its trademarks and service marks." *See, e.g.,* ECF Nos. 41-2, 41-3, 41-4, 211-4, 211-112. As discussed in Section I, A, 1, *supra*, there is a genuine issue of material fact regarding whether Guardian's Energy Saver actually provides fall protection for workers. If the Energy Saver doesn't provide fall protection, then Thermal Design's claim that Guardian is endangering worker safety may be true, and truth is an absolute defense to a defamation claim. *Anderson v. Hebert*, 798 N.W. 2d 275, 280 (Wis. Ct. App. 2011).

In its own motion, Thermal Design seeks dismissal of at least some of Guardian's defamation claims by arguing that the applicable two-year limitations period counts back

Case 2:08-cv-00828-RTR   Filed 06/15/12   Page 22 of 29   Document 256

from May 21, 2009, the day Guardian filed its counterclaims in this action.[1]  However, in Wisconsin, the "period within which a cause of action may be used as a defense or counterclaim is computed from the time of the accrual of the cause of action *until the time that the plaintiff commences the action in which the defense or counterclaim is made*." Wis. Stat. § 893.14 (emphasis added).  Therefore, the statute of limitations was tolled on October 2, 2008, the date Thermal Design filed its complaint.  *Donaldson v. W. Bend Mut. Ins. Co.*, 773 N.W. 2d 470, 479 (Wis. Ct. App. 2009).  Thermal Design argues that Guardian's counterclaims are permissive, not compulsory, and there is federal authority for the proposition that filing a claim only tolls the limitations period for compulsory counterclaims. *Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*, 892 F.2d 566, 571 (7th Cir. 1989).  But Wisconsin law appears to make no distinction between permissive and compulsory counterclaims in this context,[2] and under the *Erie* doctrine, the Court must apply state law tolling rules.  *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) ("Like the statute of limitations itself, rules that are an 'integral part of the statute of limitations,' such as tolling and equitable estoppel, are treated as substantive for purposes of the *Erie* doctrine") (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751-53 (1980)).  Guardian produced evidence of several allegedly defamatory statements that were published within the applicable limitations period (i.e., on or after October 2, 2006).  *See, e.g.,* ECF No. 231, Guardian's

---

[1]  The statute of limitations for intentional torts is now three years, Wis. Stat. § 893.57, but Guardian's claims are governed by the previous period of two years.  WI LEGIS 120 (2009-10) ("This act first applies to injuries occurring on the effective date of this subsection," which is February 26, 2010).

[2]  Even if the distinction matters, Guardian's defamation claim, like its false advertising claim, is compulsory. Section II, B, *infra*.

Additional Facts, ¶¶ 87-95; ECF No. 211-4, Pavlik Aff., Ex. 10; ECF No. 211-112, Pavlik Aff., Ex. 98. Even if the Court's analysis here is incorrect, and the limitations period should stretch back two years from May 21, 2009, there are still actionable statements within that timeframe. Moreover, statements that were made outside of the limitations period could conceivably be saved by the discovery rule. *Doe v. Archdiocese of Milwaukee*, 565 N.W. 2d 94, 103 (Wis. 1997) (the discovery rule "tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person").

Thermal Design argues for application of the "single publication rule," pursuant to which a person has only a single cause of action for defamation that is "founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 436 (7th Cir. 2009) (citing Illinois' Uniform Single Publication Act). Whether the single publication rule applies in Wisconsin appears to be an open question. *Ladd v. Uecker*, 780 N.W.2d 216, 220 (Wis. Ct. App. 2010). Even if it does, the rule cannot help Thermal Design because Guardian claims repeated instances of defamation over an extended period of time. "The single publication rule 'does not address the issue of repeated publications of the same libelous matter over a substantial period of time.' Rather, the single publication rule applies where the same aggregate communication is heard at the same time by two or more persons." *Medifast, Inc. v. Minkow*, No. 10-CV-382 JLS (BGS), 2011 WL 1157625,

-24-

at *11 (S.D. Cal. Mar. 29, 2011) (citing *Christoff v. Nestle USA, Inc.*, 213 P. 3d 132, 140 (Cal. 2009) and *Shively v. Bozanich*, 80 P. 3d 676, 686 (Cal. 2003)). In other words, repeated instances of defamation can lead to multiple causes of action, even if the content is generally the same. *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) (republication "provides the plaintiff with a remedy where the defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new audience").

Accordingly, the Court will mostly deny Thermal Design's motion, except as it applies to the April 2006 article by Dan Harkins in *Metal Construction News*, "Counterfeit System Creates Confusion, Endangers Lives." This article is outside of the limitations period, and it is undisputed that Guardian knew about the article that same month. ECF No. 232, Guardian's Response to Thermal Design's Proposed Statement of Material Facts, ¶ 187 (describing email chain discussing the article). However, the same article was essentially re-published under a slightly different title in the October 2006 edition of *Metal Architecture Magazine*. ECF No. 206-20, Ex. T ("Performance Claims of Some Insulation systems Manufacturers Creating Confusion, Endangering Lives"). With respect to these articles, Thermal Design argues that Guardian's "cease and desist" letter did not comply with Wisconsin's pre-suit notice requirements for bringing a defamation claim based on a newspaper, magazine or periodical. Wis. Stat. § 895.05(2). Guardian's letter does not specifically reference the later article, but the two articles are basically identical, and the letter generally refers to more than one article. ECF No. 236-20, Attachments to G. Pavlik

-25-

Dec., Ex. 69 ("Guardian is aware that you have been publishing *articles* . . . regarding 'counterfeit' and 'look alike' systems to TDI's Simple Saver system") (emphasis added). At minimum, the letter creates a genuine factual issue regarding whether Guardian complied with the purpose of the notice provision, which is to "give the other party an opportunity to retract the alleged libel prior to commencing suit." *It's in the Cards, Inc. v. Fuschetto*, 535 N.W. 2d 11, 14 (Wis. Ct. App. 1995).

### B. <u>Counterclaim I</u>: False Advertising (Lanham Act)

The parties agree that this claim is governed by a three-year limitations period, which is borrowed from Wisconsin's Deceptive Trade Practices Act. Wis. Stat. § 100.18(11)(b)3.; *Hot Wax* at 821. However, they disagree once again as to when the period starts running. As discussed in Section II, A, *supra*, in the context of a federal claim, the distinction between compulsory and permissive counterclaims is relevant for purposes of whether the period relates back to the original filing of the complaint. *Asset Allocation*, 892 F.2d at 571; *Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000). A compulsory counterclaim is one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). There is no "formalistic test for determining whether suits arise out of the same transaction or occurrence." *Ross ex rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 384 (7th Cir. 2007). Instead, courts should "consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *Burlington N. R.R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990).

-26-

In its counterclaim, Guardian alleges that Thermal Design's statements that the Energy Saver endangers worker safety are false. This is essentially the same issue presented by Thermal Design's false advertising claims against Guardian: whether the Energy Saver provides OSHA-compliant fall protection for workers. Therefore, the Court finds that this is a compulsory counterclaim, and the three year limitations period stretches back from the filing of the complaint on October 2, 2008. Since most (if not all) of the alleged false advertisements were published in that timeframe, the Court will deny Thermal Design's motion.

### C.    Counterclaim III: Commercial Disparagement

An action for commercial disparagement lies when the quality of a business's goods are demeaned. *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 820 (7th Cir. 2008) (citing *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E. 2d 770, 783 (Ill. Ct. App. 2006)). Thermal Design argues that Wisconsin does not recognize commercial disparagement as a separate cause of action. The Court agrees with Guardian that this is simply another way to state a claim under the general rubric of defamation. Restatement (2d) Torts § 573, cmt. g.

### D.    Counterclaim VII: Patent Infringement

Guardian alleges that Thermal Design's Dispense R product infringes upon Guardian's U.S. Patent No. 6,595,455 (the '455 patent), entitled "Rolled Fabric Dispensing Apparatus and Fall Protection System and Method." Guardian's Purlin Glide insulation system is the embodiment of the '455 patent. Thermal Design argues that it had a license to

-27-

use the '455 patent, but the license applied to a different invention that eventually became U.S. Patent No. 6,247,288 (the '288 patent). ECF No. 211-116, Pavlik Aff., Ex. 105 at TD0002082 (license agreement referring to the roof fabric dispensing device "as disclosed and claimed in a United States Patent Application attached as Exhibit A to the aforesaid assignment (hereinafter the 'Patent Rights')"), TD002083 ("LICENSE GRANTED Guardian hereby grants to TDI a nonexclusive, nonroyalty bearing license under the aforesaid PATENT RIGHTS, worldwide to manufacture, use, sell and offer for sale any device covered by any claim of the aforesaid PATENT RIGHTS . . ."). Therefore, Guardian's motion for summary judgment is granted insofar as it applies to the issue of license, leaving the remaining issues for trial. *Wis. Alumni Research Found. v. Intel Corp.*, 656 F. Supp. 2d 898, 902 (W.D. Wis. 2009) ("All that is relevant to the question whether plaintiff expressly licensed the patent" is "the language of the parties' agreements" if the language is unambiguous).

-28-

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.     The pending motions to file documents under seal [ECF Nos. 229 and 233] are **GRANTED**;

2.     Thermal Design's motion for partial summary judgment [ECF No. 200] is **GRANTED-IN-PART** and **DENIED-IN-PART**;

3.     Guardian's motion for summary judgment [ECF No. 208] is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

4.     On **July 13, 2012** at **11:00 a.m. (CST)**, the Court will initiate a conference call to discuss matters relating to the ultimate disposition of this case, including dates for trial and a possible briefing schedule for pre-trial motions.

Dated at Milwaukee, Wisconsin, this 15th day of June, 2012.

**BY THE COURT**:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

-29-